## HUNTER–BENN & CO. COMPANY v. BASSETT LUMBER CO.

### 1 Div. 700.

Supreme Court of Alabama.
Jan. 21, 1932.

Joe M. Pelham, Jr., of Chatom, and Smith & Johnston and Harry T. Smith & Caffey, all of Mobile, for appellant.

Robert H. Smith, of Mobile, and Adams & Gillmore, of Grove Hill, for appellee.

BROWN, J.

This appeal is prosecuted from a decree of the court overruling defendant's demurrers to the bill as last amended.

The bill is filed by the complainant as mortgagor pending foreclosure, to enjoin the defendant from exercising the power of sale, for an accounting, to enforce an equitable set-off, and in the alternative to redeem; the complainant offering in its bill to do equity by paying any amount or sum ascertained to be due, secured by the mortgage.

The mortgage was executed, not to secure any specific indebtedness, but to secure the faithful performance of a contract between

the parties in respect to the operation of a sawmill by the complainant in the manufacture and sale of lumber from timber on the defendant's lands, and the questions argued go to the general equity of the bill, the construction of some of the provisions of the contract respecting the right of the defendant to terminate the contract by declaring a forfeiture, and the right of the complainant to set off its alleged equitable interest in the lumber manufactured and on the mill yard against the demands of the defendant.

■ As a general rule, it is well settled that a mortgagor, by a bill filed prior to foreclosure, may protect his equity of redemption in real estate on an offer to do equity, and tender of the amount admitted to be due prior to filing the bill is not essential to its equity. Williams v. Noland, 205 Ala. 63, 87 So. 818, and cases therein cited.

■ Another familiar doctrine is that where an agreement is entered into or given merely to secure the payment of money, a forfeiture either of land, chattels, or money, incurred by its nonperformance, will be set aside on behalf of the defaulting party, or relieved against in any other manner made necessary by the circumstances of the case, on payment of the debt, interest, and costs, if any have accrued, unless the remedy is prohibited, under the special circumstances of the case, by some other controlling doctrine of equity. 1 Pom. Eq. Juris. vol. 1 (4th Ed.) § 450, p. 854; 10 R. C. L. 328, § 75.

■■ The jurisdiction to relieve against forfeitures is founded upon the principle that a party having legal rights shall not be permitted to use them oppressively to the injustice of the defaulting party, but the principle does not extend so far as to authorize a court of equity to set aside the valid stipulations of the parties upon the performance of which their rights depend. And where there is no controversy as to the balance due, and a reasonable opportunity is afforded for payment or tender, a tender of the amount due is a prerequisite to the right to invoke the jurisdiction of a court of equity to relieve from the forfeiture. Carter v. Brownell Auto Co., 217 Ala. 690, 117 So. 304.

■ "In ordinary cases time of performance is, in equity, regarded as formal, and as meaning only that the contract shall be completed within a reasonable time and substantially according to the agreement, regard being had to all the circumstances. Consequently a court of equity will generally relieve a party who has not performed his contract strictly, as to time, unless it appears affirmatively that the parties regarded it as an essential element in their agreement, or unless such a result follows from the nature and purposes of the contract. And slight circumstances are sufficient in a court of equity to

prevent a party from taking the benefit of a time stipulation." 10 R. C. L. § 78, p. 331.

■ Another principle applicable to the case in hand is, where two or more written contracts are entered into between the same parties, concerning the same subject-matter, whether simultaneously or on different occasions, under some circumstances, these will be treated as one contract, interpreted together, when this is necessary to ascertain the intention of the parties. Chicago Trust & Savings Bank v. Chicago Title & Trust Co., 190 Ill. 404, 60 N. E. 586, 83 Am. St. Rep. 138; Blagen v. Thompson et al., 23 Or. 239, 31 P. 647, 18 L. R. A. 315.

■ The contracts attached to and made Exhibits A and B to the bill, and the mortgage given to secure the faithful performance of the contract, made Exhibit F, on the principle last above stated, constitute the contract between the parties, and must be construed together to properly determine their relation, duties, obligations, and rights, and we now state our judgment as to the legal effect of said contract, as a whole.

It is clear that the relation between the complainant and the defendant is that of owner and independent contractor, the complainant as such contractor undertaking to "fully equip band saw mill plant including planer and dry kiln, all of a sufficient and appropriate capacity to properly manufacture one million feet, board measure, per month, of pine lumber of the dimensions such as constitute the average run of the outputs of plants of similar character and capacity"; to "maintain said plant in good condition and operate it exclusively, continuously and to full capacity (except as otherwise provided in the contract) in the performance of this contract until all of the trees" on the land of the owner described in the contract have been removed from said land; to construct and fully and properly equip and maintain in good condition, and operate at its own expense, all logging and tram roads necessary to the performance of the contract; to cut the timber, transport the logs to the mill, and manufacture the same into lumber, furnishing all necessary capital and labor for such purpose and sell the output of the mill, collect the proceeds of such sale, and "shall within ten days from the first day of each month, furnish the owner an inventory of the lumber cut, and of the sales of manufactured products, with the terms of the sales, the price at which they were made, and the names of the purchasers, together with a statement of all collections made during (as modified) the preceding month on account of the sales of lumber covered by this contract, and pay to the owner 30% of the sales F. O. B. raft or craft at the mill."

We set out here some of the provisions of the contract deemed pertinent to the questions to be decided:

"14th. After the contractor has entered upon said lands, or any part thereof, for the purpose of removing trees therefrom, he shall continue operations under this contract consecutively as long as the manufactured product therefrom can be sold upon an average of the following prices F. O. B. raft or craft at the mill, viz.: for pine $23.33⅓, or more per thousand feet, board measure, and for hardwood, $16.66⅔ per thousand feet, board measure; but should the market price of said lumber at any time fall below such prices, the contractor may, at his election, discontinue operations upon said lands until the products of the mill can be sold for an average of such prices, provided the contractor shall not, on account of the prices, discontinue operations, without the consent of the owner, for more than six consecutive months, nor for more than six months in any one calendar year.

"15th. The owner shall have the right to, at any time, withdraw from sale and remove from the contractor's premises, all or any part of the lumber manufactured under this contract suitable for export that it may elect to take, upon the payment to the contractor for his services in cutting the trees and manufacturing said lumber 70% of the price at which such lumber could be sold f. o. b. raft or craft at the mill, to others at the time of such withdrawal.

"Provided, however, that in no event will the owner withdraw from sale and remove from the contractor's premises any lumber manufactured under the contract or any specific order if prior to accepting said order the contractor has given the owner opportunity to order or purchase the lumber to be so manufactured and the owner has declined to do so.

"16th. The contractor shall, except as herein provided, sell the manufactured products from said lands from time to time to the best advantage and shall retain for his services in cutting the trees and manufacturing them into lumber, selling the same and collecting the proceeds thereof, and to cover all other services he may have performed, and all other expenses he may have incurred with regard to said trees and the products thereof, 70% gross of the price at which the lumber is sold F. O. B. craft or raft at the mill. When sold deliverable elsewhere than F. O. B. craft or raft at the mill, the gross price 'F. O. B. craft or raft at mill' shall be obtained by deducting from the gross price at the point of actual delivery the cost of transportation, from the mill, of the craft or raft.

"17th. *The contractor guarantees all sales of lumber made under this contract.* If lumber, at any time, is not paid for by the purchaser within six months from the date of the sale, then the contractor shall become liable to the owner for the sums payable to it, therefrom just as though the said lumber had been paid for at the termination of said period of six months. [Italics supplied.] * * *

"19th. The time covered by this contract shall be divided into periods of six months duration, commencing upon the day when the contractor commences to cut from said lands; twelve months from such commencement, and every six months thereafter, all sales of lumber made during the period ending six months prior thereto shall be averaged; if the total of the sales produce less than they would have produced if the pine timber had sold for an average of $23.33⅓ per thousand feet, board measure, and the hardwood had sold for an average of $16.66⅔ per thousand feet, board measure, all F. O. B. raft or craft at the mill, the contractor shall pay the owner the difference between 30% of the entire sales during said period and the sum that the owner would have received had it been paid an average of Seven and 00/100 ($7.00) Dollars per thousand feet, board measure, upon all pine, and five and 00/100 ($5.00) Dollars per thousand feet, board measure, upon all hardwood sold during said period.

"20th. Should the contractor fail to keep and perform any of the provisions of this contract, the owner may, at its election, terminate said contract, and all rights of the contractor to further operate under this contract shall immediately cease, but his liability for such damages as the owner may have sustained by such breach of contract, shall continue, together with his duty to *settle his account* arising out of his operations prior to the termination of said contract," etc. (Italics supplied.)

"21st. Whenever, by any other provisions of this contract, the contractor is required to do anything within a named time, or the owner is authorized to terminate this contract for the failure of the contractor to do or perform anything within a given time, or prior to a named date, and the contractor has been delayed therein by storms, floods, unavoidable breakdowns in the machinery, engines and plants, or by strikes or other causes *beyond his control*, a period equal to the time lost by reason thereof shall be added to the time within which such things is [are] required to be done, or the time of performance shall be extended to that extent." (Italics supplied.)

The mortgage, given by the complainant to the defendant, covering the sawmill plant and complainant's other property, "for the purpose of securing the payment of all loss, damage and injury that the said Hunter-Benn & Co. Company may incur or sustain by reason of any failure on the part of the said Bassett Lumber Company or the said J. M. Hemphill to faithfully perform its or his part of the aforementioned agreement, as amended, modified or supplemented," contains the following provisions:

"Provided, nevertheless, that if all the covenants, agreements and duties for the performance of which the said J. M. Hemphill bound himself and said corporation in and by the aforementioned agreement between him and the said Hunter-Benn & Co. Company, as amended, modified, or supplemented, shall be faithfully kept and performed, then this conveyance shall become null and void, and of no further force or effect.

"But should there be such a failure to faithfully perform and keep said covenants, agreements and duties or any one of them, *as to occasion any loss, damage or financial injury to the said Hunter-Benn & Co. Company*, and should such failure continue uncorrected and unremedied for as long as five days after notice thereof in writing as hereinafter provided, is given by said Hunter-Benn & Co. Company to said J. M. Hemphill and said Bassett Lumber Company, together with demand for the correction or remedying of such failure or default, then the said Hunter-Benn & Co. Company, its successors and assigns, are hereby authorized and empowered, subject to the provisions of the five paragraphs immediately following this paragraph, to take possession of all of the above described properties, rights and privileges, and sell or without taking such possession if it deem proper, sell the same to the highest bidder for cash at the Court House door of Washington County, Alabama, after first giving thirty days' notice of the time, terms and place of sale by publication once a week for three successive weeks, in some newspaper published in said county, or if there be no paper published in said county, by posting a written notice at the Court House of said County for said length of time.

"If and when Hunter-Benn & Co. Company gives notice in writing to said Bassett Lumber Company and J. M. Hemphill, or either of them, that a failure on their part to perform any of the provisions of said contract has occurred which occasions loss, damage or financial injury to said Hunter-Benn & Co. Company, the facts which constitute such failure shall be set out in the said notice and the said Bassett Lumber Company and J. M. Hemphill shall have five days from the receipt of such notice in which to correct or remedy the failure or default pointed out. If the said Bassett Lumber Company and J. M. Hemphill, or either of them, dispute or deny the truth of the allegations of fact contained in such notice they or either of them shall have the right to have the question of such truth arbitrated and shall select one arbitrator and the Hunter-Benn & Co. Company shall select one and these two shall select a third and the decision by the arbitrators shall be rendered within ten days from the receipt by J. M. Hemphill and Bassett Lumber Company of the original notice of the failure to perform the contract, the decisions or findings of such board of arbitrators, or a majority of them, as to the truth of the allegations of fact in the notice shall be binding upon the parties hereto. If the arbitrators determine that the allegations of fact, or any one of them contained in said notice, are true and that such fact or facts constitute a failure in the performance of the contract, the said Bassett Lumber Company and J. M. Hemphill shall have five days from the date of said decision in which to correct or remedy the failure or default pointed out.

"If the Bassett Lumber Company or J. M. Hemphill name an arbitrator and offer to join in a submission of the controversy to arbitration and Hunter-Benn & Co. Company refuse or fail to name a second arbitrator within two days after receipt of notice of the naming of the first arbitrator, said first arbitrator is authorized to settle and determine the dispute as to facts then pending and his decision shall be binding upon all the parties hereto. Should the said Bassett Lumber Company or J. M. Hemphill fail to name or obtain an arbitrator who will serve within the above mentioned five-day period, then and in that event said Hunter-Benn & Co. Company may immediately advertise and sell the above described property under the power of sale herein contained. The expense of any arbitration hereunder shall be borne one-half by Hunter-Benn & Co. Company and one-half by J. M. Hemphill and Bassett Lumber Company.

"The parties hereto do not intend nor agree that the questions as to whether the facts alleged in the notice constitute a breach of the contract shall be arbitrated but only the truth of said allegations of fact.

"No steps toward taking possession of the mortgaged property or foreclosing this mortgage can be taken by said Hunter-Benn & Co. Company until the expiration of the period hereinabove allowed for the remedying of a default and arbitration of a dispute as to facts or in any event if the default or failure shall be completely remedied or corrected within the time hereinabove stipulated.

"The parties hereto do not intend that the contract shall be cancelled or this mortgage foreclosed as for a breach thereof if the party in default shall within the period hereinabove stipulated *take all steps then possible to remove the default*." (Italics supplied.)

The complainant commenced its operations under the contract, and, taking the averments of the bill as true, continued, without any controversy arising between the parties, up to the last day of October, 1930, cutting approximately 92 per cent. of the timber on defendant's land, manufacturing it into lumber, selling and accounting for same, during which time mutual accounts between the par-

ties were created. And to this end the complainant had invested in equipment and labor, large sums of money.

As a result of the business depression, the demand for lumber had so decreased that it become impossible for the complainant to dispose of the mill's output, or to sell a sufficient amount to pay operating expenses and make prompt payment according to the contract, of what the parties term "stumpage" —that is, defendant's 30 per cent. of the purchase price for lumber sold and collected for —but all sales and collections were reported.

The amount due for stumpage on October 10, 1930, reported but not paid, amounted to $2,964.14. To meet this situation, complainant asked defendant, who was engaged in the business of lumber exportation, to purchase a sufficient amount of the lumber on hand to cover this account.

The defendant did not feel itself obligated to take lumber in payment of stumpage, as the correspondence between the parties set out in the bill shows, but expressed its appreciation of the situation and a willingness "to be reasonably lenient" in the matter of payment of "stumpage money."

This situation continued without change until the report of sales for the month of December was received by defendant showing a balance of $6,488.90 due to defendant for stumpage, and immediately thereafter the defendant, on January 12, 1931, gave the complainant and Hemphill the following notice: *"In addition to the liquidated damages provided* for in the contract dated February 7th, 1923, and amendments thereto dated March 3rd, 1924, and December 9th, 1924, in the event of a breach thereof, you are now indebted to Hunter-Benn & Company to the amount of $6,488.90. If this entire debt is not paid within five days from this date we will treat the contract as breached, take possession of all the property covered by the mortgage dated July 3rd, 1926, and proceed at once to foreclose said mortgage. You are notified not to sell or dispose of any of the lumber on hand at the plant until the entire amount due is paid. You are further notified to pay over to us our part of the proceeds of lumber which has already been sold." (Italics supplied.)

On the same date, defendant notified all of complainant's customers who owed for lumber purchased by them, not to pay their accounts without first obtaining a release from defendant.

The bill alleges that at this time the accounts outstanding and unpaid for lumber, if complainant had been allowed to collect the same, were sufficient to meet the deficit in the stumpage account and save a forfeiture of the complainant's rights thereunder, and because of the suspension of the right to sell, combined with the interference of the defendant with complainant's right to collect, the complainant was unable to meet the obligation to defendant.

Thereafter on January 20th defendant declared the contract forfeited, took possession of complainant's plant and all its property, together with the manufactured products of the mill then on the yard, in which the bill avers complainant had invested all of its operating capital, amounting to $50,000 or more.

At this juncture the complainant filed the original bill, and temporary injunction not being applied for, the defendant proceeded with the foreclosure, selling at public outcry, the sawmill plant, as we take it, including the land upon which the mill was located, and all of complainant's equipment, mules, and other property, which, the bill alleges, at junk prices was worth from sixteen to twenty thousand dollars, purchasing the same at said sale at and for the sum of $1,000.

We are not of opinion that the appellant's contention that the doors of a court of equity must be closed to the complainant, in the circumstances, because it failed to pay to the defendant the sum of money admitted to be due to the defendant for stumpage, within five days after written notice so to do, should be sustained. There is nothing in the circumstances disclosed by the averments of the bill going to show that the complainant was guilty of fraud, inequitable conduct, or bad faith, in its dealings with the defendant, and defendant's letter of November 5, 1930, while in no sense a modification of the contract, recognized the fact that because of the business depression the defendant was not able to dispose of lumber in sufficient quantities to meet operating expenses and pay in full the amount due for stumpage, and evinced a friendly gesture calculated to induce the belief that the defendant would not, in this respect, insist upon strict compliance with the exacting terms of the contract.

The facts stated in Ashe-Carson Co. v. Bonifay, 147 Ala. 376, 41 So. 816; Dean & King v. Elyton Land Co., 113 Ala. 276, 21 So. 213; and Fleming v. McDade, 207 Ala. 650, 93 So. 618, cited by appellant, clearly differentiate these cases from the case at bar.

The judgment here is that the defendant overstepped its right when it undertook to suspend the complainant's right to sell, and notified complainant's customers not to pay for lumber already sold. As heretofore stated, the complainant was not a mere agent, but was an independent contractor, not only to cut and manufacture the timber into lumber, but to sell the same and collect the proceeds thereof, and in addition thereto, was with the defendant Hemphill guarantor of the accounts for lumber sold. While by the

terms of the contract between the parties, the defendant retained the legal title to the lumber, until it was sold, it is clear that the equitable ownership to the extent of 70 per cent. of its market value was in the complainant, and after the sale the legal title of the accounts due for lumber sold, and the legal right and duty to collect, vested in the complainant.

The only provision in the contract authorizing the defendant to withdraw lumber from the power of sale was embodied in paragraph 15, and this was upon condition of payment to the complainant for its interest in the lumber. The contract, therefore, conferred a power of sale coupled with an interest, which could not be suspended or abrogated by the defendant. Chambers v. Seay, 73 Ala. 372; Evans v. Fearne, 16 Ala. 689, 50 Am. Dec. 197; cases cited in note 64 A. L. R. page 380.

While, as contended by appellant, if the notice given by defendant to suspend the power of sale and collection stood by itself, complainant could have ignored it and proceeded in the exercise of its right, but this notice, coupled with the notice to complainant's customers not to pay their accounts without release from the defendant, disarmed the complainant from pursuing the business of selling and collecting, and, if the averments of the bill represent true facts, prevented the complainant from meeting its obligation to pay within the five days provided by the contract and the notice given in pursuance thereof.

■ We are of opinion that the right to terminate the contract because of complainant's failure to pay stumpage embodied in paragraphs 20 and 24 of the contract was modified by the provisions in the mortgage requiring five days' notice as a predicate to the exercise of such power.

■ While the jurisdiction of courts of equity to relieve against forfeitures does not justify a disregard of valid stipulations of the parties upon the performance of which their rights depend, yet the rule of general application is that stipulations in contracts intended to work a forfeiture of a valuable right will be strictly construed, and strict compliance therewith by the party claiming the forfeiture will be exacted, and doubtful provisions will be resolved against the right to claim such forfeiture. Carter v. Brownell Auto Co., supra; Protective Life Ins. Co. v. Thomas, 223 Ala. 106, 134 So. 488; 6 R. C. L. 744, § 129.

Another contention is that the mere fact that the property covered by the mortgage was sold at a price greatly disproportionate to its value, where the sale, as here, was at public outcry, under the power of sale in the mortgage is not ground for equitable interference; that this principle applies only to private sales in exercise of such power, and the cases of Johnson Bros. v. Selden, 140 Ala. 420, 37 So. 249, 103 Am. St. Rep. 49; Harmon v. Dothan National Bank, 186 Ala. 360, 64 So. 621; Zadek v. Burnett, 176 Ala. 89, 57 So. 447, 450; and Marsh v. Elba Bank & Trust Co., 221 Ala. 683, 130 So. 323, are cited to support this contention.

We are not of opinion that these cases deny the right of the mortgagor to show that the property was sacrificed at public sale. The two cases first cited were actions at law and involved private sales. The others were proceedings in equity involving foreclosures by private sales, and in Zadek v. Burnett, supra, the effect of the authorities was "to hold a mortgagee who sells at private sale responsible and accountable for at least the fair and reasonable value of the property, regardless of the price actually received by him. *The rule is, of course, less rigid where the sale is at public outcry.*" (Italics supplied.)

■ "A sale under a power contained in a mortgage or trust deed is always presumed to be regular and valid, and mere inadequacy in the price bid does not in itself invalidate or affect the sale, otherwise properly conducted, unless it is so great as to shock the conscience of the court, and especially in the absence of a showing that a larger price could be obtained on a resale. If, however, the sum reported is so grossly inadequate as to indicate fraud or a want of reasonable judgment and discretion in the trustee by which the property is sacrificed, the sale may, on timely application, be vacated and a resale ordered, and a court will be particularly inclined to set the sale aside when in addition to inadequacy of price other circumstances exist rendering it inequitable for the sale to stand." 19 R. C. L. 614, § 431; Kelly v. Carmichael, 217 Ala. 534, 117 So. 67.

■ It is not necessary to invoke the principle just stated in this case, however, for the reason that the foreclosure was made pending the suit, and the authorities are agreed that such foreclosure, if complainant is entitled to relief, will not be allowed to prejudice his rights. Carroll v. Henderson, 191 Ala. 248, 68 So. 1; Thompson v. Atchley, 201 Ala. 398, 78 So. 196; Fair v. Cummings, 197 Ala. 131, 72 So. 389; Burns v. Mortgage Bond Co. of N. Y., 199 Ala. 77, 73 So. 987.

■ In view of the fact that the bill shows that the defendant overstepped its right by interfering with the complainant's right to sell and collect for lumber sold, acts which were reasonably calculated to prevent the complainant from meeting its obligation to pay, the fact upon which the defendant acted in declaring the forfeiture, a tender of the amount admitted to be due was not essential to the equity of the bill.

The decree merely overruled the demurrer to the bill as last amended, without ruling on the demurrer to parts of the bill, and a review on such demurrer is not properly presented. Pollak v. Stouts Mountain C. & C. Co. et al., 184 Ala. 331, 63 So. 531; Sandlin v. Anders, 210 Ala. 396, 98 So. 299.

The decree of the circuit court appears to be free from error, and it will be affirmed.

Affirmed.

ANDERSON, C. J., and THOMAS and BOULDIN, JJ., concur.