Knox Kershaw II (hereinafter "Knox") commenced an action in various capacities against his brother, Royce Kershaw, Jr. (hereinafter "Royce"), and Kershaw Manufacturing Company, Inc. (hereinafter "KMC"), arising out of matters occurring with respect to the administration of the estate of their mother, Miriam M. Kershaw. Royce and Knox are the only children of Royce Kershaw, Sr., and Miriam M. Kershaw. The trial court, after a hearing at which testimony was presented, entered a judgment enforcing in terrorem clauses[1] in inter vivos trusts created by Miriam M. Kershaw (hereinafter "Mrs. Kershaw") and in her will. In so holding, the trial court determined that Knox was not entitled to any interest under Mrs. Kershaw's will or under any trust established by her of which he was a beneficiary. The trial court further held that other claims made by Knox were moot. The trial court then severed matters relating to the administration of Mrs. Kershaw's estate and certified the judgment enforcing the in terrorem clauses as final and immediately appealable pursuant to Rule 54(b), Ala.R.Civ.P. Knox appeals. We affirm in part, reverse in part, and remand.
 I. Factual Background
Miriam M. Kershaw's late husband, Royce Kershaw, Sr. (hereinafter "Royce Sr."), and his brother, Knox, founded KMC. Royce Sr. and his brother Knox litigated over matters related to KMC for decades. Eventually, Royce Sr. became the sole owner of KMC. *Page 945 
Upon Royce Sr.'s death in 1971, the KMC stock passed by inheritance to his family and to family trusts. Mrs. Kershaw received certain shares of cumulative preferred stock of KMC, and she remained a director of the company. Royce and Knox each owned certain shares of preferred and common stock of KMC, and First Alabama Bank of Montgomery (now Regions Bank) owned certain shares of KMC preferred and common stock under the terms of testamentary trusts created pursuant to Royce Sr.'s will.
After their father's death, Royce and Knox began to run the company and discord among brothers reappeared in the second generation. The difficulties culminated in 1983 with an agreement pursuant to which Knox's interest in KMC was purchased for approximately $12 million. At the time of the sale, Mrs. Kershaw, Royce, Knox, and First Alabama Bank of Montgomery entered into an agreement ("the 1983 Agreement"), which includes the following provision:
 "6. Sale of Stock or Assets or Merger. Royce Kershaw hereby agrees that during his lifetime
". . . .
 "(c) he will not vote his shares of Class A Common Stock of KMC in favor of a sale of all or substantially all of the assets of KMC unless KMC will be completely liquidated and dissolved immediately after any such sale of assets."
Paragraph 12 of the 1983 Agreement provides that it is binding upon and inures to the benefit of the successors, assigns, heirs, and personal representatives of the parties thereto. Not long after the buyout, Knox and the company of which he assumed ownership after the buyout sued Royce and KMC. This Court has considered matters arising from this dispute on at least four occasions.[2]
Approximately 15 years after the execution of the 1983 Agreement, on November 6, 1998, substantially all of the assets of KMC were sold to Progress Rail Services Corporation. Exercising the right conferred upon her by the 1983 Agreement,[3] Mrs. Kershaw had instructed Royce to vote his shares of class A common voting stock in favor of the sale of assets to Progress Rail. Knox maintains that as a result of the sale KMC received funds substantially in excess of those of its debts and obligations that were not assumed by Progress Rail and that the sale resulted in cash to KMC more than sufficient to redeem all of Mrs. Kershaw's stock and debt. KMC was not immediately liquidated as Knox insists it should have been pursuant to paragraph 6 of the 1983 Agreement. Royce, as president and controlling shareholder of KMC, took no action to dissolve KMC, to pay KMC's indebtedness to Mrs. Kershaw, or to redeem any of Mrs. Kershaw's shares of KMC stock.
Mrs. Kershaw executed a will and established three inter vivos trusts of which she was the life beneficiary. (Those trusts are hereinafter referred to as "Trust No. 1," "Trust No. 2," and "Trust No. 3.") Upon Mrs. Kershaw's death on March 2, 1999, Royce and Rodger Davis, Royce's personal assistant and a longtime employee of KMC, became the cotrustees of Trust No. 1. During her lifetime, Mrs. Kershaw had *Page 946 
placed her shares of KMC preferred stock in Trust No. 1. Royce is the principal remainder beneficiary of Trust No. 1.
Upon Mrs. Kershaw's death, Knox and Davis became the cotrustees of Trust No. 2. No shares of KMC stock were held in Trust No. 2. Knox is the principal remainder beneficiary of Trust No. 2.
Royce, Knox, and Davis became the cotrustees of Trust No. 3 upon Mrs. Kershaw's death. A marital trust was created for Mrs. Kershaw under Royce Sr.'s will; the corpus of the trust included shares of preferred stock in KMC. Royce Sr.'s will gave Mrs. Kershaw a power of appointment over the assets of the marital trust. In her will, Mrs. Kershaw exercised her power of appointment over the assets in the marital trust created in Royce Sr.'s will and directed that those assets be placed in Trust No. 3. Trust No. 3 provides that all stock held by it in KMC and affiliated entities, and/or any bonds, promissory notes, or other indebtednesses of KMC and affiliated entities be distributed to Royce. Trust No. 3 further requires that property not otherwise distributed shall be divided in equal shares and paid to the trustees of Trust No. 1 and Trust No. 2 for placement in the respective trusts.
Knox contends that had KMC been immediately liquidated in late 1998 as he says the 1983 Agreement required, the assets in the form of KMC stock in the marital trust would have been converted to cash, and upon Mrs. Kershaw's exercise of the power of appointment over the assets of the marital trust in favor of Trust No. 3, that cash would then have been divided equally between Trust No. 1 and Trust No. 2. Under this scenario, Royce, as principal remainder beneficiary of Trust No. 1, and Knox, as principal remainder beneficiary of Trust No. 2, would have shared equally. Thus, according to Knox, if liquidation had occurred, the additional cash in the estate would have increased Knox's inheritance by $1.6 million and diminished Royce's inheritance by the same amount.
Mrs. Kershaw's will names three coexecutors: Royce, Knox, and Davis. Knox retained counsel and challenged Royce's failure to liquidate and dissolve KMC as Knox argues is required under the 1983 Agreement. At Knox's request, counsel for the estate drafted a petition for instructions seeking answers to questions concerning Royce's rights and the obligations he owed the estate under the 1983 Agreement. Royce refused to join in the proposed petition for instructions.
After Royce refused to agree to file the proposed petition for instructions, Knox sought the advice of disinterested counsel on the issue of Royce's alleged breach of the 1983 Agreement and the possibility of a claim against the firm that had provided independent legal advice to Mrs. Kershaw. Knox was advised that he had standing to bring a proceeding in good faith with respect to the 1983 Agreement and that it was a case that could be successfully brought. He was further advised not to bring an action at that time against the firm that had represented Mrs. Kershaw. After further negotiations with Royce were unsuccessful, Knox brought the action now before this Court.
 II. Course of Proceedings
Knox filed a claim in the probate court asserting that the estate had claims against Royce and KMC related to the 1983 Agreement. Knox subsequently filed this action in the circuit court in his capacities as coexecutor of the estate, as cotrustee of certain trusts Mrs. Kershaw created, and in his individual capacity as a beneficiary. He named Royce, individually, and KMC as defendants. Knox then removed the administration of the estate to the circuit court. *Page 947 
In the circuit court action, Knox alleged breach of contract, tortious interference with an inheritance, and breach of fiduciary duty. He also sought a declaratory judgment and other relief. In the declaratory-judgment portion of his complaint, Knox asked the court to determine the effect of the liquidation provision in the 1983 Agreement, the proper allocation of over $4 million in estate-tax liabilities, and the proper use of proceeds from life insurance policies on Mrs. Kershaw's life purchased by KMC in 1974 and 1983 and payable to KMC. Knox claims that the policies were purchased to provide liquidity to Mrs. Kershaw's estate. According to Knox, the proceeds of approximately $1.4 million in life insurance payable to KMC were intended to enable KMC to redeem Mrs. Kershaw's preferred stock at her death. Had this occurred, he says, the proceeds of the sale could then have been distributed equally between Knox and Royce, as principal beneficiaries of Trust No. 1 and Trust No. 2, rather than the KMC stock remaining an asset in Trust No. 3, which, according to its terms, must be distributed to Royce.
When Royce and Davis, in their capacities as cotrustees and coexecutors, refused to join in the action as co-plaintiffs, Knox filed a petition seeking to join Royce and Davis pursuant to Rule 19, Ala.R.Civ.P., or to dismiss the coexecutors and cotrustees from their duties through a judgment of severance. Royce and KMC moved to dismiss the action.
The trial court denied Knox's petition to compel joinder or to dismiss the coexecutors and cotrustees. The trial court concluded that Knox lacked the authority to act singly in filing this action as a coexecutor and/or cotrustee. The trial court reasoned that coexecutors and cotrustees must act jointly and in concert when filing an action and that this case was not an appropriate one for adding or severing coexecutors or cotrustees. The trial court thereupon dismissed for lack of standing those claims brought by Knox in his capacity as coexecutor or cotrustee.
The trial court also rejected Knox's standing in his capacity as a beneficiary on the ground that beneficiaries under a will have no title until the estate is settled and disbursements are made from the estate by the executors. The trial court further observed that Knox's allegations could be made in proceedings related to the administration of the estate. The trial court also observed that in those proceedings, which were then pending in the circuit court, having been removed from the probate court, Knox could avail himself of the statutory procedure for removal of an executor or trustee if he saw fit.
The trial court also held that Knox lacked standing to bring an action alleging breach of contract arising out of the 1983 Agreement because there had been no allegation or proof that Knox had any agreement with Royce or any contractual relationship with Royce that would support such a cause of action.
The trial court rejected Knox's claim for tortious interference with the expectancy of an inheritance on the ground that it is not a recognized cause of action under Alabama law. The trial court further found that even if such cause of action were recognized, Knox had made no allegation or showing that Mrs. Kershaw had been fraudulently induced to make her will or to dispose of any property.
The trial court also dismissed Knox's claims for restitution, an accounting, and the imposition of a constructive trust because there was no allegation of fraud, mistake, coercion, or abuse of a confidential relationship and because he had available to him the remedy of an accounting in *Page 948 
the proceedings concerning the administration of the estate.
The trial court dismissed Knox's breach-of-fiduciary-duty claim, made in his capacity as an individual beneficiary, because Knox failed to show that he owned any stock in KMC and that KMC owed any duty to him. Moreover, the trial court further observed that a breach-of-fiduciary-duty claim on behalf of Mrs. Kershaw's estate must fail because that tort claim did not survive her death.
The trial court dismissed Knox's claims arising from KMC's alleged failure to pay dividends on the ground that Knox was not a stockholder and that he had no standing to contest such violation. Further, with respect to any violation of a right of inspection, the trial court again observed that Knox was not a stockholder and that there was no showing that he had requested an inspection in accordance with § 10-2B-16.02, Ala. Code 1975.
The trial court refused to dismiss the declaratory-judgment count to the extent that it raised issues other than a declaration of rights with regard to KMC. As to that aspect of the declaratory judgment seeking "any declaration of right with regard to KMC," the trial court granted the motion to dismiss and dismissed KMC as a defendant. On April 25, 2001, the trial court entered an order clarifying its earlier order and stating that the only remaining issues involved in the declaratory-judgment action dealt with the construction of the will concerning allocation of estate-tax liability and the proceeds of life insurance payable to KMC.
Royce filed a counterclaim seeking a determination that Knox had forfeited his inheritance by reason of having violated the in terrorem
clauses in the will and trusts. Those clauses are substantially similar. Item VI of the will provides as follows:
"Limitation on Provisions for Sons
 "If either of my sons in any manner, directly or indirectly, contests or attacks the validity of this Will or the validity of any trust created by me and in existence at the time of my death or any disposition made under this Will or under any Trust created by me and in existence at the time of my death by filing suit against my executor or the trustee of any trust created by me or otherwise, then any share or interest given to such son, directly or indirectly, or to any trust for the benefit of such son or his lineal descendants under this Will or under any trust created by me and in existence at the time of my death shall be disposed of in the same manner as if such son and all of his descendants had predeceased me."
A similar provision appears in each of the three trusts under the heading "Limitation on Distribution."
The trial court subsequently conducted a hearing related solely to the effect of the in terrorem clauses in the trusts and the will. The trial court found that the in terrorem clauses were clear and unambiguous and that they were valid and binding on both sons. Nevertheless, the trial court received ore tenus evidence from, among others, the attorney who drafted the in terrorem clauses after meeting with Mrs. Kershaw. The trial court, in a subsequent order, characterized this testimony as evidence showing Mrs. Kershaw's distress over the history of family litigation and her desire to avoid such litigation and stated that "the goal of the in terrorem clauses was to avoid any disputes or litigation between her sons regarding the distribution of assets and to insure that the dispositions in her will and trusts were fulfilled." *Page 949 
The trial court concluded that if the action was solely one seeking declaratory relief[4] it would not invoke the in terrorem clauses. The trial court then concluded that Knox was not directly contesting the validity of the will or the trusts and thus had not violated that aspect of the in terrorem clauses. Nevertheless, the trial court found that, "at the very least, Knox has challenged and/or attacked in this action the disposition of property in the will and trusts." The trial court relied upon Knox's contention that different amounts would be distributed to the two beneficiaries if he prevailed on his claims concerning the 1983 Agreement or his claims with respect to the use of the proceeds of the life insurance policies.
The trial court further found a violation of the in terrorem clauses arising from Knox's filing an action in his capacity as coexecutor, cotrustee, and a beneficiary of the estate against Royce, also a coexecutor of the will and a cotrustee. Pointing to Knox's petition to have Royce and Davis either joined as plaintiffs or dismissed as coexecutors and cotrustees, and noting that it had rejected that petition, the trial court concluded that Knox was guilty of action "otherwise" in violation of the in terrorem clauses. The trial court ultimately concluded that Knox's litigation constituted an action against the other coexecutors and cotrustees "in an effort to change distributions." Thus, the trial court found Knox guilty of violating thein terrorem clauses.
The trial court rejected Knox's "good-faith" defense, assuming that such a defense is recognized in this State, on the ground that Knox did not fully disclose all the facts to the attorney he consulted for a second opinion. For example, this attorney was not made aware of the existence of the in terrorem clauses when he advised Knox. The trial court then held that Knox had forfeited his inheritance and dismissed all other claims, other than matters relating to the probate of Mrs. Kershaw's will, as moot.
 III. Standard of Review
Despite the fact that the trial court made findings of fact in this case based on evidence presented ore tenus, we review its judgment de novo because the dispositive issue presents a question of law. The presumption of correctness accorded to the decision made by a trial court after hearing evidence presented ore tenus applies to findings of fact resolving disputed evidence, not to conclusions of law. Eubanks v. Hale,752 So.2d 1113, 1144-45 (Ala. 1999); McCluney v. Zap Prof'l Photography, Inc., 663 So.2d 922, 924 (Ala. 1995).
 IV. Issues Before This Court
Knox asserts five issues on appeal. Those issues can be summarized as follows: (1) whether a coexecutor of an estate or a beneficiary of an estate or a trust can, under the circumstances of this case, prosecute an action the cofiduciaries have refused to bring; (2) whether the trial court erred in admitting and considering extrinsic evidence of Mrs. Kershaw's intent concerning the in terrorem clauses, which the trial court found to be unambiguous; (3) whether Knox, under the circumstances of this case, violated the terms of the in terrorem clauses, thereby forfeiting his inheritance; (4) whether Alabama recognizes a "good faith and/or probable cause" exception to the enforcement of an in terrorem
clause; and (5) whether Alabama recognizes a cause of action for *Page 950 
tortious interference with an expectancy in an inheritance or a bequest. We confine our review to these issues. Knox does not challenge the trial court's dismissal of KMC as a defendant; therefore, that aspect of the judgment is affirmed.
Because an affirmance of that portion of the trial court's judgment that held that Knox had violated the in terrorem clauses would, for all intents and purposes, defeat Knox's interest in pursuit of most, if not all, of his claims on behalf of the estate or as a beneficiary, the most logical issue to address first deals with the trial court's application of the in terrorem clauses.
 A. The In Terrorem Clauses
The parties agree that only one Alabama case exists dealing with the enforceability of an in terrorem clause. In Donegan v. Wade,70 Ala. 501, 505 (1881), the will provided:
 "`It is my will, that if any one of my children shall resist the probate of my will, or petition to break or set it aside, such child or children shall not have any part of my estate whatever, and the portion intended for such child shall be distributed among those of my children mentioned in item No. 8 who shall not oppose my will, in the same way that the balance of my estate is therein directed to be distributed; the child or children opposing my will being excluded from any participation therein.'"
This Court stated:
 "It is not denied that this [in terrorem clause] is a legal or valid condition, when attached to a legacy or devise. Its purpose, too, is clear. It was designed to prevent the inauguration or prosecution of a suit or contest in the courts, commenced with the view of defeating the will of the testator as he had seen fit to make it. Such contests often breed irreconcilable family feuds, and lead to disgraceful family exposures. They not unfrequently, too, waste away vast estates, by protracted and extravagant litigation."
70 Ala. at 505. One beneficiary, a daughter of the decedent who had filed a petition to contest the will, resisted forfeiture by relying on the fact that the petition had been dismissed. The Court rejected her argument that the fact that the petition had been dismissed was of consequence, noting that her conduct in filing the contest "constituted opposition to that unlitigated probate or establishment of her father's will, which it was his great care to secure." 70 Ala. at 506. In other words, she had violated the express terms of the in terrorem clause. The other beneficiary, a brother of the petitioner in the will contest, resisted forfeiture on the ground that his sister, and not he, had filed the contest. This Court found evidence of the beneficiary's behind-the-scenes payment of expenses and management of the litigation as sufficient to invoke the in terrorem clause as to the brother. The Court held:
 "To relieve him under such circumstances, and, at the same time, to visit her with the penalty of a forfeiture, would be, in effect, to permit the law to place a premium on artifice, and to suffer the just reproach of seeking after the shadow instead of the substance."
70 Ala. at 506.
As was the case in Donegan,[5] the issue of the enforceability of an in terrorem clause has not been asserted in this case. We treat such clauses as enforceable for purposes of this appeal. *Page 951 
Both sides contend that the in terrorem clauses are unambiguous, but both sides insist on different results from the plain language. Royce and KMC, however, now artfully suggest on appeal that an ambiguity might exist in the in terrorem clauses.[6] The simple fact that a writing is described by adversaries as unambiguous while each insists on a different interpretation does not render the writing ambiguous. Wayne J. GriffinElec., Inc. v. Dunn Constr. Co., 622 So.2d 314, 317 (Ala. 1993);Englund's Flying Serv., Inc. v. Mobile Airport Auth., 536 So.2d 1371
(Ala. 1988). A document is unambiguous if only one reasonable meaning emerges. Wayne J. Griffin Elec., Inc.; Reeves Cedarhurst Dev. Corp. v.First Amfed Corp., 607 So.2d 184 (Ala. 1992). Whether a document is ambiguous is a question of law that this Court reviews de novo. SeeMobile Eye Center, P.C. v. Van Buren P'ship, 826 So.2d 135, 138 (Ala. 2002) ("'Thus, we apply a de novo review to a trial court's determination of whether a contract is ambiguous and to a trial court's determination of the legal effect of an unambiguous contract term.'" (quotingWinkleblack v. Murphy, 811 So.2d 521, 525-26 (Ala. 2001)).
We begin our search for the existence of one reasonable unambiguous meaning with a parsing of the relevant portions of the in terrorem
clauses. The language in the trusts and the will is virtually the same; we focus on the clause found in the will. Shorn of unnecessary verbiage, the in terrorem clause reads as follows:
 "If either of my sons in any manner, directly or indirectly, contests or attacks the validity of this Will or the validity of any trust . . . or any disposition made under this Will or under any Trust . . . by filing suit against my executor or the trustee of any trust created by me or otherwise, then any share or interest given to such son . . . shall be disposed of in the same manner as if such son and all of his descendants had predeceased me."
The trial court concluded that Knox did not violate that aspect of thein terrorem clauses prohibiting an attack on the validity of the will or the trusts. We agree. The trial court concluded that Knox violated the interrorem clauses in that he attacked the validity of "any disposition
made under this Will or under any Trust." (Emphasis added.) Because Knox's claims, if successful, would have increased his share of the distribution under the trusts, the trial court concluded that Knox had violated that portion of the in terrorem clause. The trial court obviously has treated "disposition" as being synonymous with "distribution." The trial court, in its order, stated: "However, the court does not agree that he [Knox] is not contesting or attacking distributions and/or dispositions under the will and trust." (Emphasis added.) By the time the trial court stated its ultimate conclusion in the order, the word "dispositions" had been dropped from the lexicon: "By filing this action Knox, in his capacity as co-executor, co-trustee, and beneficiary, has attacked and contested distributions under the will and trusts and he has also sued the other co-executors and co-trustees in an effort to change distributions." (Emphasis added.)
Knox directs our attention to § 43-2-640, Ala. Code 1975, which authorizes an *Page 952 
executor or administrator to make distribution of the whole or any part of the property once satisfied that the estate is solvent. Obviously, under this statute, distribution of estate assets is a function of the executor or administrator — not the testator. Knox further cites § 43-2-691, dealing with the summary disposition of small estates and defining "distributees" as "[t]he persons who are entitled to the personal property of a decedent under the terms of a testamentary disposition or under the Alabama descent and distribution statutes." Again, the function of an executor or administrator with reference to the distribution of estate assets is set apart from the function of the testator with reference to testamentary disposition.
This dichotomy recurs in other parts of the Code. For examples of the use of "disposition" in the context of activities of the testator, see § 43-8-222 ("The intention of a testator as expressed in his will controls the legal effect of his dispositions. The rules of construction expressed in the succeeding sections of this article apply unless a contrary intention is indicated by the will."); § 35-4-295 ("When a power to dispose of lands is confined to a disposition by devise or will, the instrument of execution must be by will, duly executed as wills of real estate are required by law."); § 43-8-141 ("A will may dispose of property by reference to acts and events which have significance apart from their effect upon the dispositions made by the will, whether they occur before or after the execution of the will or before or after the testator's death. The execution or revocation of a will of another person is such an event."); § 43-8-221 ("The meaning and legal effect of adisposition in a will shall be determined by the local law of a particular state selected by the testator in his instrument unless the application of that law is contrary to the provisions relating to the elective share described in sections 43-8-70 through 43-8-75, the provisions relating to exempt property and allowances described in sections 43-8-110 through 43-8-113, or any other public policy of this state otherwise applicable to the disposition."); and § 43-8-229 ("A general residuary clause in a will, or a will making general disposition of all of the testator's property, does not exercise a power of appointment held by the testator unless specific reference is made to the power or there is some other indication of intention to include the property subject to the power.").
On the other hand, for references to activities on the part of persons other than a testator with respect to "distribution," see § 12-13-1(5), stating that the probate court shall have jurisdiction over "[t]he sale and disposition of the real and personal property belonging to and thedistribution of intestate's estates"; and Commentary to § 43-2-830
("In the absence of testamentary disposition, personal property nevertheless devolves to personal representative for distribution to decedent's heirs or to those indicated as substitutes for them in cases involving disclaimer or renunciation or other circumstances affecting devolution of intestate estates.") (2000 Cum. Supp.).
The separate functions of distribution and disposition have been addressed in the same statute. See, e.g., § 35-4-297 ("When adisposition under a power is directed to be made by, between or among several persons, without specifying the sum or share to be allotted to each, all the persons designated are entitled to an equal proportion; but when the terms of the power import that the estate or fund is to bedistributed between the persons so designated, in such manner or proportion as the trustee of the power may think proper, the distribution
or apportionment made by such trustee cannot be impeached on the *Page 953 
ground that it is unsubstantial, illusory or nominal."); the previously referenced definition of "distributees" in § 43-2-691(1) ("The persons who are entitled to the personal property of a decedent under the terms of a testamentary disposition or under the Alabama descent anddistribution statutes."); and § 43-2-692(h) ("To each surviving spouse, child or other distributee who is entitled to take under Alabama's descent and distribution laws, or, alternatively, to each devisee entitled to take under any testamentary disposition of the decedent.").
The pattern of confining the application of the term "disposition" to the acts of the testator and the term "distribution" to the duties of the executor or the administrator is supported by definitions in Black's LawDictionary (7th ed. 1999). "Disposition" is defined as "[t]he act of transferring something to another's care or possession, esp. by deed or will; the relinquishing of property a testamentary disposition of all the assets"; "closing of estate" is defined as "[t]he completion of the administration of a decedent's estate, brought about by the administrator's distribution of estate assets, payment of taxes, and filing of necessary accounts with the probate court"; "distribution" is defined as, "[a]t common law, the passing of personal property to an intestate decedent's heirs. Cf. descent (1). 2. The act or process of apportioning or giving out"; a "probate distribution" is defined as "[t]he judicially supervised apportionment and division — usu. after the payment of debts and charges — of assets of an estate among those legally entitled to share"; a "trust distribution" is defined as "[t]he cash or other property paid or credited to a trust beneficiary"; "distributive clause" is defined as "[a] will or trust provision governing the distribution of income and gifts"; and "distributive share" is defined as "[t]he share that an heir or beneficiary receives from the legal distribution of an estate." See also State ex rel. Dryden v. Thym,282 S.W.2d 178 (Mo.Ct.App. 1955).[7]
Royce and KMC dismiss Knox's contention that the trial court erred when it treated distributions and dispositions synonymously as "splitting hairs." In this case of splitting heirs, we cannot embrace such a casual dismissal of the trial court's erroneous conflation of the terms distribution and disposition. Nor do we consider our construction hypertechnical. The record makes it clear that we are not dealing with words clumsily chosen by an unsophisticated layperson, as is often the case with other written instruments. Mrs. Kershaw's wills and trusts were drafted by competent counsel. We find no basis in this record upon which to conclude that Knox has challenged any act of Mrs. Kershaw as settlor of the trusts or as testatrix with respect to the dispositions made in either the trusts or the will. Knox's challenges leave intact the formulas in the trusts and the will; they affect only the amount of the payout when those formulas are applied to the assets. Consequently, we cannot say that Knox has "directly or indirectly, contest[ed] or attack[ed] . . . any disposition made under this Will or under any Trust created by me." We *Page 954 
must therefore look elsewhere for a violation of the in terrorem clauses.
The trial court also concluded that Knox had violated the in terrorem
clauses by petitioning to have Royce and Davis joined as coplaintiffs or dismissing them as coexecutors and cotrustees; the trial court concluded that his doing so constituted action that "otherwise" violated the interrorem clause. However, the phrase "or otherwise" in the in terrorem
clause appears after the reference to the condemned conduct of contesting or attacking the validity of the will or the trusts or any disposition under the will or trusts. Specifically, after listing the condemned acts, the in terrorem clauses provide that those acts are accomplished "by filing suit against my executor or the trustee of any trust created by me or otherwise." (Emphasis added.) Knox contends that the phrase "or otherwise" refers to any trust created by Royce Sr. Even conceding, as Royce and KMC contend, that the phrase "or otherwise" refers to some action other than filing a lawsuit against the executor or the trustee, in the absence of Knox's attacking or contesting the validity of the will or the trusts or attacking or contesting the disposition made under the will or the trusts, it is not necessary to reach the scope of any restriction in the in terrorem clauses on the means employed to reach those ends.
Having concluded that the in terrorem clauses are not ambiguous, i.e., that from a reading of those clauses "one reasonable meaning" emerges and that Knox has not violated the letter of the in terrorem clauses, we must return to Donegan. The sister in Donegan who filed the contest clearly violated the letter of the in terrorem clause. However, this Court found her brother, who had coached from the sideline, just as guilty, observing, "[a]nd the participation of David Wade, Jr., in such contest, was of the same character, however deficient in the candor of open resistance." 70 Ala. at 506. The brother, by aiding and abetting behind the scenes, violated the spirit, if not the letter, of the clause. We must decide whether this Court's rejection in Donegan of an artifice to avoid the impact of the in terrorem clause permits an expansive approach to the application of the in terrorem clauses now before this Court so as to warrant the conclusion that Knox, like the brother in Donegan, also violated the spirit, if not the letter, of the clauses and is therefore subject to the penalty of forfeiture. We answer that question in the negative.
Unlike the case here presented, at least one of the beneficiaries inDonegan clearly violated the letter of the unambiguous in terrorem
clause. The court in Donegan was confronted with the prospect of the unpalatable disparate treatment of two parties. To be sure, a literal application of the in terrorem clause would have spared the brother from forfeiture. However, reliance upon Donegan as support for enforcing an interrorem clause in all instances where the court finds a violation of the spirit but not the letter of such a clause would embrace a rule of construction favoring forfeiture. As a general proposition, in settings other than an in terrorem clause, this Court has embraced a policy of strict construction of contractual provisions calling for forfeiture. See, e.g., Hunter-Benn Co. v. Bassett Lumber Co., 224 Ala. 215,222, 139 So. 348, 353 (1932) ("the rule of general application is that stipulations in contracts intended to work a forfeiture of a valuable right will be strictly construed, and strict compliance therewith by the party claiming the forfeiture will be exacted, and doubtful provisions will be resolved against the right to claim such forfeiture"). We are persuaded by the weight of authority from *Page 955 
other jurisdictions as expressed in Claudia G. Catalano, Annotation,What Constitutes Contest or Attempt to Defeat Will Within ProvisionThereof Forfeiting Share of Contesting Beneficiary, 3 A.L.R. 5th 590 § 2[a] (1992) ("Consistent with the often expressed view that the law abhors a forfeiture, no-contest provisions are looked upon with some disfavor and have been strictly construed. . . . A breach of a forfeiture clause will be declared only when the acts of a party come strictly within its expressed terms."). The holding in Donegan imposing a penalty for a violation of the spirit and not the letter of the interrorem clause is limited to the facts presented there — where another beneficiary was guilty of a clear violation of the letter of thein terrorem clause.
Even if we were disposed to treat Donegan as establishing a rule whereby the penalty for violating an in terrorem clause can be imposed in all cases when the spirit, but not the letter, of the clause has been violated, we would have to face the practical problem of determining the spirit of the in terrorem clause in a setting, such as is presented here, where the in terrorem clause, as we have previously determined, is unambiguous. The trial court therefore erred in admitting parol evidence concerning the testator's intention.[8] See Ex parte EmployeesRetirement Sys. Bd. of Control, 767 So.2d 331, 334-35 (Ala. 2000) ("This Court has stated that in interpreting a will `[e]xtrinsic evidence is not admissible to vary, contradict or add to the plain and unambiguous language of the will.' Cook v. Morton, 254 Ala. 112, 116, 47 So.2d 471,474 (1950). This Court often has stated that it will not look beyond the four corners of an instrument unless the instrument contains latent ambiguities. Martin v. First Nat'l Bank of Mobile, 412 So.2d 250, 253
(Ala. 1982)."). This problem is avoided by limiting Donegan to instances where there has been a clear violation of the unambiguous terms of an interrorem clause by at least one beneficiary. Because no violation of thein terrorem clause occurred here, we need not reach Knox's contention that we should recognize a good-faith exception to the enforcement of such clauses. We reverse the trial court's judgment insofar as it held that Knox violated the in terrorem clauses.
 B. Standing
As previously noted, the trial court concluded that Knox, who is a coexecutor and a cotrustee, lacked the authority to act singly in filing this action. The trial court reasoned that coexecutors and cotrustees must act jointly and in concert when filing an action and that this case was not an appropriate one for adding or severing coexecutors or cotrustees. The trial court thereupon dismissed those claims Knox brought in his capacity as coexecutor or cotrustee for lack of standing.
In arguing that he has standing to bring this action, Knox relies uponStone v. Jones, 530 So.2d 232 (Ala. 1988), in which this Court recognized that one of several coexecutors had the authority to act singly with respect to ministerial matters, but that unanimity was required with respect to discretionary matters. Concluding that the commencement of litigation was a discretionary *Page 956 
matter, this Court then endorsed the following course of action where a coexecutor could not persuade other coexecutors to commence litigation. The Court noted:
 "[A] co-executor who wishes to file a suit on behalf of the estate, but is unable to convince the other co-executor(s) to join in the suit, might petition the court to either compel the joinder of the co-executor pursuant to Rule 19, Ala.R.Civ.P., or to dismiss the co-executor from his or her duties through a judgment of severance and allow the lone co-executor to proceed."
530 So.2d at 235. This Court then reversed the trial court's judgment and remanded the case to permit the appellant to "employ one of the procedures set forth in this opinion." 530 So.2d at 235.
Knox, relying upon Stone v. Jones, filed the very petition recommended in that case. The trial court, observing that neither fraud nor abuse of discretion was alleged in the complaint, reiterated the general rule requiring unanimity of action with respect to the discretionary act of commencing litigation and concluded that "this is not an appropriate case in which to either add or sever co-executors or co-trustees."
Knox points to the possible financial disadvantages to Royce from such litigation and Davis's status as Royce's employee as sufficient basis for permitting this action to proceed at the behest of only one coexecutor. Royce points to Knox's financial interest in his individual capacity in the event that the litigation is successful. Royce argues that strict standards must govern the availability of the remedy prescribed in Stonev. Jones or the rule requiring unanimity of coexecutors would become meaningless.
The remedy contemplated in Stone v. Jones is comparable to the general rule stated in 31 Am. Jur.2d Executors and Administrators § 1155 (2002) ("If a designated co-executor will not join in the suit, the practice is to file the appropriate pleading in his name and then require him to proceed."). Royce's protestation that the value of the estate remains unchanged by the result of the litigation begs the question. The more troubling concern expressed by Royce relates to Knox's similar conflict of interest and the damage to the estate in incurring attorney fees in what Royce contends is groundless litigation. Royce even suggests that all the coexecutors would have conflicts and therefore there would be no coexecutor at all. However, the principal risk to the estate is attorney fees that might be incurred unnecessarily in pursuit of Knox's claims on behalf of the estate to the extent those claims are unsuccessful. Mutual conflicts of interest and any underlying skepticism on the part of the trial court as to the likelihood of success on the merits or concerns over accommodating spite-driven litigation cannot justify the draconian effect of the trial court's cryptic conclusion that this is not "the appropriate case" for the severance or addition of coexecutors or cotrustees.
We agree with Royce that Stone v. Jones does not stand for the proposition that petitions to compel the joinder or severance of coexecutors should be granted as a matter of right. The necessity for unanimity should not lightly be set aside simply on the whim of a single coexecutor who files the petition invited in Stone v. Jones. A remedy to protect an estate from frivolous proceedings while providing a forum for a coexecutor's assertion of what it might consider valid claims can be fashioned by recognizing that a coexecutor is not entitled to proceed singly as a matter of right and then attaching conditions to allowing the requested relief. Compare Rule 41(a)(2), Ala.R.Civ.P., where the *Page 957 
voluntary dismissal of an action by the plaintiff is made subject to "such terms and conditions as the court deems proper." A requirement of payment of an attorney fee is an appropriate condition under Rule 41(a)(2). Mass. Appraisal Servs., Inc. v. Carmichael, 372 So.2d 850, 852
(Ala. 1979). Where the Legislature is the source of an agency's power, the Legislature "`can validly impose any reasonable condition upon its exercise as the legislature sees fit.'" Mobile Housing Bd. v. Brook,285 Ala. 244, 246, 231 So.2d 115, 116-17 (Ala. 1970) (quoting MobileHousing Bd. v. Cross, 285 Ala. 94, 97, 229 So.2d 485, 488 (1969)) (the Legislature could require the housing board to pay all reasonable costs of proceedings on appeal, including a reasonable attorney fee to be assessed by the court). Likewise, the right to petition for the relief sought by Knox first recognized in Stone v. Jones is equally subject to the court's inherent authority to attach conditions upon that relief.
Attachment of conditions lies within the trial court's discretion. Therefore, under the circumstances here presented, the court's rejection altogether of Knox's right to proceed singly as coexecutor and cotrustee, without an opportunity to be heard on the merits, constituted an abuse of discretion. We reverse the trial court's judgment insofar as it denies Knox's petition to realign or sever and instruct the trial court to grant the relief and allow Knox to proceed singly as coexecutor and cotrustee upon the condition that Knox post, in his individual capacity, a bond as security for the costs and attorney fees incurred by the estate or for which the estate might be liable to third parties to the extent that the litigation on the behalf of the estate or trusts is unsuccessful. Because of the foregoing conclusion as to Knox's standing as a coexecutor and cotrustee to assert claims on behalf of the estate, it is unnecessary to reach his separate argument that he has standing to proceed as a beneficiary.
The trial court also held that Knox lacked standing to bring a breach-of-contract action arising out of the 1983 Agreement because of the absence of "any allegation or showing" that Knox had any agreement with Royce or any contractual relationship with Royce that would support such a cause of action. Knox filed a timely objection to Royce and KMC's motion under Rule 12(b), Ala.R.Civ.P., and alternatively moved for a continuance to permit discovery pursuant to Rule 56(f), Ala.R.Civ.P. The trial court denied this motion. Because the claims with respect to the 1983 Agreement are fact intensive, it is inappropriate to resolve them on a motion to dismiss based on no allegation or showing having been made. We reverse the trial court's judgment insofar as it dismisses the claims related to the 1983 Agreement for further proceedings in the event Knox accepts the condition attached to the granting of his petition.
 C. Tortious Interference With an Inheritance
Knox asks this Court to recognize a cause of action for tortious interference with an inheritance. Knox relies upon Restatement (Second)of Torts § 744B. Based upon our analysis of the word "disposition" and our conclusion that Knox has done nothing to interfere with Mrs. Kershaw's dispositions in her capacities as either settlor or testatrix, we hold that Knox has suffered no interference with an inheritance even if we were to recognize such a cause of action in this proceeding. We affirm the trial court's judgment insofar as it dismisses the claim alleging tortious interference with an inheritance.
 V. Conclusion
We reverse the trial court's judgment insofar as it finds Knox guilty of violating *Page 958 
the in terrorem clauses in the trusts and the will and insofar as it denies Knox's petition seeking to join Royce and Davis pursuant to Rule 19, Ala.R.Civ.P., or to dismiss the coexecutors and cotrustees from their duties through a judgment of severance, and we remand the case with instructions that the trial court enter an order granting that relief conditioned upon the posting of a bond as previously described. We also reverse the trial court's judgment insofar as it dismisses Knox's claims relating to the 1983 Agreement. Finally, we affirm the trial court's judgment insofar as it dismisses Knox's claim alleging tortious interference with an inheritance and insofar as it dismisses KMC as a defendant.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Houston, See, Brown, Johnstone, Harwood, and Woodall, JJ., concur.
Moore, C.J., and Stuart, J., concur in the result.
[1] An in terrorem clause is "[a] provision designed to threaten one into action or inaction; esp., a testamentary provision that threatens to dispossess any beneficiary who challenges the terms of the will." Black's Law Dictionary 825 (7th ed. 1999).
[2] Knox Kershaw, Inc. v. Kershaw, 598 So.2d 1372 (Ala. 1992); Ex parteKnox Kershaw, Inc., 562 So.2d 250 (Ala. 1990); Knox Kershaw, Inc. v.Kershaw, 552 So.2d 126 (Ala. 1989); Kershaw v. Knox Kershaw, Inc.,523 So.2d 351 (Ala. 1988).
[3] Under the 1983 Agreement, because KMC was in arrears in the payment of dividends to her, Mrs. Kershaw had the right to direct Royce's vote.
[4] Presumably, the trial court was referring to those aspects of the declaratory-judgment action dealing with the allocation of estate-tax liability and the proceeds of life insurance that survived Royce and KMC's motion to dismiss.
[5] "It is not denied that [an in terrorem clause] is a legal or valid condition, when attached to a legacy or devise."70 Ala. at 505.
[6] Royce and KMC state in their brief to this Court: "However, it is possible that, given the very unusual facts of this case, combined with the unusually broad nature of these in terrorem clauses and the oblique nature of Knox's attacks, that this Court might conclude that there is an ambiguity which results from the application of the clauses to the facts, which would constitute a latent ambiguity."
[7] "The term `distribution' when applied to the estate of a deceased person refers to the ultimate division of the estate among the next of kin, in case of intestacy, or among the beneficiaries under a will, after the estate is free from debt. Thomson v. Tracy, 60 N.Y. 174, loc. cit. 180 [(1875)]. As there pointed out, the term is defined in Bouvier's Law Dictionary to be, in practice, `the division, by order of the court having authority, among those entitled thereto, of the personal estate of an intestate, after payment of the debts and charges; and, sometimes, "the division of a residue of both real and personal estate, and, also the division of an estate according to the terms of a will."'" 282 S.W.2d at 184.
[8] Such evidence obviously influenced the trial court's conclusions. The first six pages of the court's order discuss the testimony of Mrs. Kershaw's attorney and Davis as to Mrs. Kershaw's wishes. The trial court also observed:
 "However, it is not often that a court has the benefit of such a full and complete background of the reasons the mother wanted to place such provisions in her will and trusts. It is clear that the mother went to great extremes to thwart any further litigation between her sons and, unfortunately, that is exactly what occurred."