796 F.2d 1435
 14 Bankr.Ct.Dec. 1403, Bankr. L. Rep. P 71,410
 In re MARTIN BROTHERS TOOLMAKERS, INC., Debtor.
MARTIN BROTHERS TOOLMAKERS, INC., Plaintiff-Appellant,
v.
INDUSTRIAL DEVELOPMENT BOARD OF the CITY OF HUNTSVILLE and
Central Bank of the South, Defendants-Appellees.
 No. 85-7165.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 18, 1986.
 
 Philip A. Geddes, Decatur, Ala., for plaintiff-appellant.
 John M. Heacock, Jr., Huntsville, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before RONEY and CLARK, Circuit Judges, and FAIRCHILD*, Senior Circuit Judge.
 CLARK, Circuit Judge:
 
 
 1
 Appellant-debtor Martin Brothers Toolmakers, Inc. (Martin Bros.) brings this appeal from an adversary proceeding in bankruptcy. Martin Bros. sought a judgment declaring its lease agreement for manufacturing facilities to be a mortgage rather than a true lease. Appellee-lessor, the Industrial Development Board of Huntsville, Alabama (IDB), opposed the action on grounds that the bankruptcy court had already determined the agreement to be a true lease and had ordered appellant to accept or reject the lease under 11 U.S.C. Sec. 365(a).[1] IDB was joined in this action by appellee Central Bank of the South, trustee of the IDB bond issue which had financed construction of the building occupied by Martin Bros. The bankruptcy court entered summary judgment in favor of IDB and Central Bank, finding the agreement to be a true lease. The district court reviewed the matter de novo and affirmed the judgment on different grounds. Martin Bros. claims error by the district court, asserting that the court was mistaken in finding that the parties intended to create a lease rather than a mortgage.
 
 
 2
 The parties' contentions on appeal raise two issues. The first is whether the lease characterization is res judicata by virtue of the bankruptcy court's initial order to the debtor, requiring it to affirm or reject the lease within 90 days of order. The second issue is whether the district court erred in its selection of controlling law and consequently erred in its conclusion that the parties intended a lease. We raise sua sponte an issue preliminary to our review of the district court's opinion, namely whether this court has jurisdiction to hear an appeal from a district court order declaring an agreement to be a true lease.I. Appellate Jurisdiction
 
 
 3
 This court has jurisdiction over final district courts orders and other interlocutory orders not here at issue. See 28 U.S.C. Secs. 1291-92. Before reviewing the orders below, we must find the district court order final in itself or find some exception to that requirement. "Finality" has traditionally been defined as a decision adjudicating all rights, "leaving nothing for the court to do but execute judgment." See Catlin v. United States, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945). The traditional rule narrows the concept of finality to avoid waste of judicial resources and the delay inherent in piecemeal litigation. See id., 65 S.Ct. at 634. Nonetheless, certain doctrines have refined the concept, rendering appellate jurisdiction flexible enough to handle the practicalities of complex litigation.
 
 
 4
 The collateral order doctrine is, for example, just such a refinement. It provides that an order resolving issues independent and easily separable from the other claims in the action may be reviewed if delay would prejudice important interests of the parties and if practical rather than technical factors also favor immediate review. See Cohen v. Beneficial Industrial Loan, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The Forgay-Conrad rule is another qualification of the traditional rule, allowing review whenever an order directs "immediate delivery of physical property and subjects the losing party to irreparable harm" if appellate review is delayed until conclusion of the case. See Forgay v. Conrad, 6 How. 201, 47 U.S. 201, 12 L.Ed. 404 (1847). Perhaps the most extreme refinement of the finality concept is found in Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964), which holds that even an order of marginal finality should be reviewed if the question presented is fundamental to further conduct of the case. All of these doctrinal exceptions to the strict rule of finality ultimately rest on a single theory: the scope of appellate jurisdiction must be defined by balancing "the costs and inconvenience of piecemeal review on the one hand and the danger of denying justice on the other." Id., 85 S.Ct. at 311 (quoting Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950)). Consequently, the statutory requirement of finality is a flexible concept, grounded in the practicalities of the situation.
 
 
 5
 This accommodative approach is vital in the context of bankruptcy. Viewed realistically, a bankruptcy case is simply an aggregation of controversies, many of which would constitute individual lawsuits had a bankruptcy petition never been filed. While the goal of the bankruptcy process is to bring all present and potential contestants together and decide all the claims at the same time, a truly simultaneous resolution is impossible. Each claim represents a variable which must be quantified before a dividend is fixed or a workable reorganization plan adopted. Delayed review of any particular claim, especially claims involving key assets of the debtor's estate, would render any distribution or plan purely contingent until completion of appeals after conclusion of the case. Such an approach would be especially devastating in reorganizations, which proceed most smoothly when at least some variables become fixed and operate as the basis for further negotiation.
 
 
 6
 In recognition of these factors, finality of bankruptcy orders cannot be limited to the last order concluding the bankruptcy case as a whole. This circuit and others reviewing bankruptcy decisions have freely applied the collateral order doctrine and the Forgay-Conrad rule to escape such results. See In re Regency Woods Apartments, 686 F.2d 899 (11th Cir.1982); In re Olson, 730 F.2d 1109 (8th Cir.1984); In re Saco Local Development Corp., 711 F.2d 441 (1st Cir.1983); In re Mason, 709 F.2d 1313 (9th Cir.1983). Some courts, including our own, have also concluded that any order within a bankruptcy case which concludes a particular adversary proceeding should be deemed final and reviewable. See In re Charter Co., 778 F.2d 617 (11th Cir.1985); In re Saco Local Development, supra. This approach is particularly suitable in the case at hand, since the order below affirmatively characterizes the transaction as a lease and leaves in full force the prior order to affirm or reject. No action remains for the court below with respect to the status of the lease. This result is completely consistent with the fact that this declaratory judgment action would have been final and reviewable had it occurred outside bankruptcy proceedings. Thus, our court has jurisdiction and we proceed to the merits of the case.
 
 
 7
 II. Lease or Mortgage?
 
 
 8
 Appellant contends that the district court erred in finding the agreement to be a true lease. Proper consideration of this issue requires a detailed review of the facts. In 1976, appellant-debtor decided to locate manufacturing facilities in the City of Huntsville, Alabama. Appellant entered into a lease agreement with appellee IDB for occupancy of an industrial facility built to appellant's specifications. IDB funded construction by issuing $500,000 in industrial development bonds. Central Bank serves as trustee for the issue and presently holds 100 percent of the bonds. The bond issue is secured by a mortgage on the building and related property, and a security agreement which includes an assignment to the trustee of IDB's rights under the lease agreement. Only IDB and Central Bank are parties to the mortgage, security agreement and bond indenture.
 
 
 9
 The lease agreement between IDB and Martin Bros. provides for rent payable semi-annually, in an amount equal to the "principal and interest due" on the bonds issued by IDB. The rental obligation abates if the bonds are fully pre-paid[2] during the lease term. Martin Bros. bears the responsibility for insuring the property, paying tax assessments and covering operating expenses of the property. The lease term runs through July 31, 1986, the same day the underlying bond issue is to be completely repaid. Nonetheless, Martin Bros. has two options exercisable at that date: to renew the lease at $15,000 annual rent or to purchase the property for $5,000.[3]
 
 
 10
 Martin Bros. performed under the lease agreement until it defaulted in February, 1982. In December, 1982, it filed a bankruptcy petition as debtor-in-possession. Three months later, Central Bank filed a complaint in the bankruptcy court, seeking a Sec. 365 order to compel Martin Bros. to either affirm or reject the lease.[4] A hearing was held, and on March 28, 1983 the court ordered the debtor to act within ninety days. Before the order expired, but after the time for appeal had lapsed, Martin Bros. brought this action to declare the agreement a mortgage outside the scope of Sec. 365. Central Bank and IDB filed for summary judgment, as did the debtor. The bankruptcy court looked to the U.C.C. for guidance in construing the documents and found the agreement to be a lease despite the presence of a purchase option.[5]
 
 
 11
 Martin Bros. appealed and the district court affirmed. The district court did not discuss the U.C.C. and found other factors supporting a lease characterization. Considering Alabama law, the court found that the parties lacked the intent to create a mortgage because such an arrangement was foreclosed by Alabama's tax-exempt industrial development finance statute. The parties had to denominate and intend the agreement to be a lease since Martin Bros. could not borrow the proceeds of the industrial development bonds directly from the bond holders.[6] Furthermore, the parties had a significant incentive to comply with state requirements and create a lease since financing with industrial development bonds resulted in lower borrowing costs for IDB and lower rental payments for Martin Bros.
 
 
 12
 Appellees argue that we need not reach the issue of whether the agreement is a lease rather than a mortgage because the bankruptcy court's order of March 28, 1983, precludes further litigation of the issue. In that order, the bankruptcy court directed the debtor-in-possession to affirm or reject the lease agreement as provided in Sec. 365. Appellees claim that the lease characterization was put in issue at the hearing prior to the order, and therefore the matter is res judicata. We note that neither the bankruptcy court nor the district court addressed the claim of res judicata. Therefore, we assume, without deciding, that the matter is not precluded and we consider the ultimate issue, the proper characterization of the agreement.
 
 
 13
 Appellant contends that the lease agreement must be construed as a mortgage from Martin Bros. to the Bank because that is what the parties intended all along. Appellant maintains that the parties' intent is clear when all the documents, lease, mortgage and assignment, are read together. From these, appellant reasons that IDB is merely a conduit for funds, a straw party playing a role in the transaction only because state law prohibits a loan of tax-exempt bond proceeds directly to a private corporation.
 
 
 14
 It is true that a real estate lease, as well as an installment sales contract, may be the functional equivalent of a secured financing transaction. See Aaron, Bankruptcy Law Fundamentals p 9.05 (1986); see also In re Kassuba, 562 F.2d 511 (7th Cir.1977); In re Central Foundry Co., 48 B.R. 895 (Bkrtcy.N.D.Ala.1985); In re Booth, 19 B.R. 53 (Bkrtcy.D.Utah 1982). The determination in bankruptcy, however, of whether a particular agreement is in fact a lease or a security agreement for purposes of Sec. 365 often depends on which characterization will best serve the interests of the estate. Section 365 enables the bankruptcy trustee to affirm or reject leases and executory contracts, and is based on the trustee's long-standing power to abandon obligations burdensome to the estate. See 2 Collier on Bankruptcy, 15th ed. p 365.01 (1986). Consequently, some courts have explicitly held that if a particular agreement is not unduly burdensome or is especially advantageous, it should not be construed as an agreement subject to Sec. 365. See, e.g., In re Becknell & Crace Coal Co., Inc., 761 F.2d 319 (6th Cir.1985) (construing lease-purchase agreement of coal field); In re G-N Partners, 48 B.R. 462 (Bkrtcy.D.Minn.1985) (construing option to purchase realty); In re Waldron, 36 B.R. 633 (Bkrtcy.S.D.Fla.1984) (same). As the Sixth Circuit has explained:
 
 
 15
 The key, it seems, to deciphering the meaning of [Sec. 365's lease-executory contract provision] is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, the [agreement] is not [a lease or executory contract] within the meaning of the Bankruptcy Act.
 
 
 16
 761 F.2d at 322.
 
 
 17
 In this case, for several reasons, we do not reach the stage of analyzing the nature of the transaction from the Bankruptcy Code's pragmatic perspective. First, and most importantly, this case does not involve a simple two-party lease or vendor-vendee installment agreement. The transaction at hand involves three distinct parties, each with different interests at stake. The Bank, as bond trustee and sole bondholder, entered into the transaction to lend funds through the bond issue and receive a suitable return on the loan. Now that the bond issue is in default, the Bank's interest lies in obtaining a swift cure of default and resumption of bond payments. Martin Bros., as lessee, executed the agreement to acquire industrial space in Huntsville at a favorable cost. It now seeks to avoid forfeiture of the property so that it may continue to operate and reorganize, with benefit of the advantageous rent provided in the lease. IDB, as lessor and mortgagor, also entered into the agreement with its own objectives. IDB has played anything but a passive role in the transaction and cannot be considered a mere straw or sham.
 
 
 18
 For example, IDB has some rights and duties indicative of ownership of the property. Under the lease agreement, IDB owes a duty of quiet enjoyment to its tenant and has the right to re-enter the property on default. IDB also possesses the equity of redemption, despite its assignment of the lease as collateral for the mortgage. See Darling Shop of Birmingham v. Nelson Realty Co., 262 Ala. 495, 79 So.2d 793 (1955). Furthermore, IDB holds these rights and duties for a unique purpose. According to its legislative authorization, IDB entered into the disputed agreement "to acquire, enlarge, improve, replace, own, lease and dispose of properties to the end that [it] may be able to promote industry, develop trade and further the use of the agricultural products and natural and human resources of [Alabama]." Ala.Code Sec. 11-54-81.
 
 
 19
 Consequently, IDB's interest in the property cannot be equated with that of any other party. IDB's interest is not purely financial, like the Bank's, nor is it limited to concern for the welfare of a single industrial company like Martin Bros. Rather, IDB's interest is much broader, having as its goal increased employment and production in the Huntsville area without undue regard as to which specific company furnishes that increase. To dismiss IDB as a straw party would be to slight, and possibly harm, its vital public function. The application of bankruptcy principles in this context would be particularly inappropriate, because such principles are developed in the context of only two competing private interests, and in this case we have a third, public, interest.
 
 
 20
 A second reason not to pursue a bankruptcy law analysis stems from the fact that the disputed lease agreement differs importantly from the sort of contracts construed in Becknell or G-N Partners, supra. As a lease incident to a tax-exempt industrial development bond issue, the agreement is governed by Alabama's industrial development statute. We have noted that Alabama does not authorize IDB to lend bond proceeds directly to private industrial companies. See note 6, supra. Instead, IDB may only borrow money and deal in real property as owner, lessor, mortgagor or grantor. See Ala.Code Sec. 11-54-81. Were we to find for appellant and deem the agreement a mortgage, IDB would assume the forbidden status of mortgagee and the state tax exemption would be lost. With it would go much of IDB's leverage in attracting new industry to Huntsville, for the tax-exemption diminishes IDB's cost of borrowing and construction, automatically resulting in lower rent and operating costs for potential lessees.[7]
 
 
 21
 A final reason to pretermit analysis under Sec. 365 lies in the doctrine of equitable estoppel. Estoppel "comes into play where a party takes a position in one instance inconsistent with that party's position in another instance, to another's prejudice." Williams v. FNBC Acceptance, 419 So.2d 1363 (Ala.1982). The inconsistency here is appellant's assertion of mortgagor status after it has entered into a lease agreement with appellee. This turn about is particularly offensive to equitable principles since Martin Bros. has received significant benefits, namely lower rent and operating costs, from executing a lease agreement as required by Alabama law.[8]
 
 
 22
 Further, if we were to accept appellant's arguments, substantial prejudice to IDB would result. IDB assumed that it had created a valid lease which gave it a landlord's typical rights and remedies, including the right to re-enter the premises on default. This right enables IDB to remove an unsuccessful tenant and relet the premises to another company capable of improving employment and production in the Huntsville area. Characterization of the lease as a mortgage would deprive IDB of this right and significantly reduce its ability to generate industrial development. Consequently, appellant is estopped from claiming that the lease agreement is a mortgage.
 
 
 23
 For these reasons, we affirm the district court's holding that the agreement executed by appellant and appellee is a lease subject to Sec. 365 of the Bankruptcy Code.
 
 
 24
 AFFIRMED.
 
 
 
 *
 Honorable Thomas E. Fairchild, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 11 U.S.C. Sec. 365(a) provides in pertinent part that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."
 
 
 [2]
 Pre-payment under the lease requires payment of all principal and all interest due on the bonds until maturity or the first practical date of redemption. Thus, prepayment cannot reduce the interest cost implicit in the rental amount
 
 
 [3]
 Martin Bros. may also exercise the purchase option for $5,000 at any time during the lease term if it also prepays the bonds in full. See note 2 supra
 
 
 [4]
 Under the indenture between IDB and Central Bank as Trustee for the bond holders, IDB agreed that the Bank could pursue any of IDB's remedies as lessor for default of the Lease Agreement by Martin Bros. Pursuant to that agreement, Central Bank sought a Sec. 365 order
 
 
 [5]
 Ala.Code Sec. 7-1-201(37) eliminates two considerations in distinguishing a lease from a security interest:
 Whether a lease is intended as security is to be determined by the facts of each case; however, (1) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.
 
 
 [6]
 See Ala.Code Sec. 11-54-89 (IDB bonds may be repaid solely from the lease or sale of property, thus implying that repayment cannot be made from funds received in payment of a subsequent loan of bond proceeds to an industrial entity)
 
 
 [7]
 Martin Bros. attempts to avoid this implication of its argument by claiming that the alleged mortgage runs not between itself and IDB, but between itself and the Bank as sole bondholder. Thus, the state tax exemption would not be jeopardized by a ruling adverse to IDB. In support of this claim, appellant cites Hunter-Benn & Co. v. Bassett Lumber Co., 234 Ala. 215, 139 So. 348 (1932), for the proposition that all the documents in the transaction, including lease, mortgage and assignment must be construed as a single agreement. According to appellant, this unified agreement allocates all of IDB's rights and obligations between the remaining parties and thereby creates a mortgagor-mortgagee relationship
 Having reviewed both Hunter-Benn and the documents, we reject appellant's contentions as neither of the above will bear appellant's interpretation. Unified construction of multiple documents is appropriate only when each of the documents is executed by the same parties. See id., 139 So. at 349. That is not the case here, as Martin Bros. is not a party to the mortgage and the Bank is not a party to the lease. Furthermore, the lease agreement specifically provides that "The lessee shall not be deemed a party to the [mortgage] and reference in this Lease Agreement to said [mortgage] shall not impose any liability or obligation upon lessee other than its specific obligations and liabilities undertaken in this Lease Agreement." Since appellant expressly assumed no obligation under the mortgage, it cannot have gained a benefit thereunder, particularly not the status of mortgagor.
 
 
 [8]
 Indeed, the very existence of these benefits and appellant's long delay in repudiating them suggests that appellant actually intended to enter into a lease agreement rather than a mortgage. As indicated in the discussion of the industrial development statute, lower rent and operating costs were possible only by complying with the statute and executing a lease. Appellant's willingness to enter into the transaction on IDB's terms suggests that the benefits provided by tax-exempt bond financing were in fact the basis of the bargain. Appellant's contention that lower cost was just "gravy on the biscuit" is not credible