[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 5, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-15900

_____

D. C. Docket No. 04-02518-CV-MHS-1
BKCY No. 98-68798-BKC-JE

In Re:  Builders Transport, Inc.,

                                                            Debtor.

_____

TWO TREES, a New York general partnership,
DAVID C. WALENTAS,
JANE WALENTAS,
THE CIT GROUP/BUSINESS CREDIT, INC.,

                                              Plaintiffs-Appellants,

versus

BUILDERS TRANSPORT, INC.,

                                              Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(December 5, 2006)**

Before EDMONDSON, Chief Judge, BIRCH and ALARCON,[*] Circuit Judges.

BIRCH, Circuit Judge:

This appeal involves a turnover action in bankruptcy pursuant to 11 U.S.C. § 542 filed by the debtor, Builders Transport, Inc. ("BTI"). BTI seeks to recover certain standby letter of credit proceeds that were drawn down and retained by The CIT Group/Business Credit, Inc. ("CIT"), which was the assignee of BTI's lessor, Two Trees, whose two general partners are David C. Walentas and Jane Walentas. The standby letter of credit was created to secure BTI's obligations to Two Trees under a lease agreement that was part of a sale-leaseback transaction. The complicated facts surrounding the sale-leaseback transaction in this case belie a simple conclusion. The letter of credit proceeds, minus certain lessor damages, belong to BTI's estate and should be turned over. We AFFIRM the judgments of the bankruptcy and district courts as to both liability and damages.

## I. BACKGROUND

A. Factual Background

Most of the facts in this case are undisputed. Quoting liberally and making changes as necessary, we largely adopt the bankruptcy court's statement of the facts in its 30 September 2002 order: BTI was in the trucking business. Its

[*]Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth Circuit, sitting by designation.

headquarters facility located in Camden, Kershaw County, South Carolina had been constructed with the proceeds of industrial revenue bonds, and BTI leased the facility from Kershaw County until 1995. In that year, the bonds were paid, and BTI was entitled to purchase the property for $1.

BTI's primary lender was CIT. BTI and CIT entered into an amended and restated financing agreement in 1993, which was thereafter amended from time to time, pursuant to which CIT provided to BTI a revolving line of credit, term loan, and letter of credit facilities, secured by virtually all of BTI's assets. In 1990 BTI had written off worthless stock of a satellite messaging company, producing a capital loss carryforward for tax purposes that would expire on 31 December 1995. For several months prior to October 1995, BTI had explored selling and leasing the Camden property.

In the fall of 1995, $1,530,000 of the capital loss carryforward remained unused and could not be used unless BTI had sufficient income in that fiscal year to offset the loss. Stanford M. Dinstein was an officer and director of BTI's parent company, Builders Transport Incorporated ("BTI Parent"), a public company and sole shareholder of BTI, and was apparently the architect of the sale and leaseback plan involving Two Trees; that is, Two Trees would purchase the Camden property and lease it back to BTI.

In considering Dinstein's proposal, officers of BTI and BTI Parent consulted their outside accountants, Ernst & Young, who advised them concerning the structure of the deal and what facts would support the legitimacy of the sale and leaseback and hence the ability to successfully use the loss carryforward. For tax reasons, Ernst & Young advised against having BTI guarantee the obligations of Two Trees to CIT.

On 5 October 1995, the Board of Directors of BTI Parent met to consider the sale and leaseback deal with Two Trees. At that time, David Walentas was a general partner in Two Trees and Chairman of the Board of BTI Parent, as well as Chairman of the Board of BTI. Walentas did not attend the 5 October 1995 Board meeting, however. Nor did he act on behalf of Two Trees, as one of its general partners, in connection with these transactions. Instead, Dinstein chaired that Board meeting. He also represented Two Trees as its attorney in fact in the sale and leaseback transactions. The Board, with Dinstein abstaining, unanimously approved resolutions authorizing the sale and leaseback transactions between BTI and Two Trees.

The following day, BTI Parent, as the sole shareholder of BTI, by Robert Garner, its corporate secretary, executed a written consent in lieu of a shareholder meeting adopting resolutions on behalf of BTI approving the transactions and

4

authorizing officers to execute and deliver the appropriate documents. That consent, attached as an exhibit to Mr. Garner's affidavit filed on 26 June 2000, states in part: "FURTHER RESOLVED, that it is in the best interest of [BTI] to obtain a letter of credit in the amount of up to $1.6 million in favor of Two Trees . . . securing [BTI's] lease obligations to Two Trees."

The deal closed on or about 11 October 1995. Two Trees purchased the Camden property from BTI for $3.5 million and leased the property back to BTI. The lease agreement provided for a five-year term, commencing on 12 October 1995, with BTI having the option to renew the lease for four successive periods of five years each at then fair market rent. The lease agreement provided that BTI would obtain a letter of credit to secure its obligations under the lease. On or about 12 October 1995, Dai-Ichi Kangyo Bank ("DK Bank") issued a letter of credit in favor of Two Trees in its capacity as lessor, on behalf of BTI, in the amount of $1.6 million "to support [BTI's] obligation to pay rent and other amounts under the lease."

Two Trees borrowed from CIT the $3.5 million it paid to BTI for the Camden property. In agreements executed by Dinstein, Two Trees secured its obligation to CIT with a mortgage on the Camden property and with an assignment of its interest in the lease agreement with BTI and in the letter of credit issued by

5

DK Bank. The rent paid by BTI went directly to CIT pursuant to a lockbox agreement between CIT and Two Trees. The amount of BTI's monthly lease payment was $37,825, which was the amount of the note payment due from Two Trees to CIT. Had the note of Two Trees to CIT been amortized according to its terms, Two Trees would still have owed CIT in excess of $2,000,000 at the end of the 60-month lease term.

CIT and DK Bank executed a reimbursement agreement, wherein CIT was obligated to reimburse DK Bank for any payments made by DK Bank on standby letters of credit that DK Bank issued at the request of CIT, in its role as assignee of Two Trees. In the event that CIT was obligated to reimburse DK Bank for money paid under a letter of credit issued for BTI's benefit, the financing agreement between BTI and CIT obligated BTI to reimburse CIT for the same amount. During the course of these transactions, the financial institutions collected their fees associated with the issuance of the letter of credit and related agreements.

On 21 May 1998, BTI Parent, BTI, and related companies filed for Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 101 et seq. Subsequent to the petition date, BTI continued for a few weeks to operate the business as debtor-in-possession. Virtually all of BTI's assets secured prepetition debt to CIT and to the CIT Group/Equipment Financing, Inc. With court approval, BTI and CIT

6

companies stipulated to the use of cash collateral by BTI and to the grant of a postpetition security interest in BTI's assets to secure the claims of the CIT companies.

It quickly became obvious to everyone involved in the case that BTI's efforts at reorganization as a going concern could not be successful. BTI conducted a public auction of certain parts of its business on 29 June 1998, and the bankruptcy court approved the sale of those assets to Schneider National, Inc., in an order entered on 10 July 1998. The asset purchase agreement between BTI and Schneider permitted Schneider to occupy the Camden property on a shared use basis with BTI for four months with Schneider to pay 75% of the rent to Two Trees.

On 9 July 1998, CIT, as BTI's lender, sent a notice to DK Bank that BTI's obligations under the lease agreement had been accelerated. On 15 July 1998, DK Bank notified CIT, as the lender to and assignee of Two Trees, that because CIT had accelerated the debt of BTI, the letter of credit would expire in 30 days. On 15 July 1998, CIT, as lender to and assignee of Two Trees, submitted to DK Bank a completed "Default Draft" for $1.6 million.

On or about 22 July 1998, DK Bank paid $1.6 million to CIT, as lender to Two Trees, and CIT, as BTI's lender, reimbursed DK Bank in the amount of $1.6

million.  On or about 22 July 1998, CIT, as BTI's lender, charged the amount of $1.6 million to BTI's line of credit, which was secured by property of the estate. Also on 22 July 1998, CIT, as lender to Two Trees, used the $1.6 million received from DK Bank, to pay down the debt Two Trees owed CIT.

The sale of assets to Schneider closed on 3 August 1998.  At the closing, Schneider, BTI, and CIT executed a termination agreement and a closing statement, which set forth the amount of CIT's secured claim, which included the $1.6 million charge to BTI's line of credit for the reimbursement of DK Bank.  CIT received payment of its claim from the purchase price paid by Schneider.  CIT released its lien on BTI's assets, with the exception of certain accounts created pursuant to the termination agreement, and the financing agreement between CIT and BTI was terminated.

In October or November 1998, Schneider vacated the Camden property; BTI had previously moved out.  On 10 September 1999, Two Trees sold the Camden property to a third party.

B.  Procedural History

On 12 October 1999, BTI filed a turnover complaint in the bankruptcy court against CIT, Two Trees, David Walentas, and Jane Walentas ("Appellants"). Count I of the complaint, which is the only one at issue in this appeal, argued that

the $1.6 million in proceeds from the standby letter of credit constituted estate property, subject to turnover pursuant to 11 U.S.C. § 542 to the extent the proceeds exceeded Two Trees's allowed lease rejection claim under 11 U.S.C. § 502(b)(6). Appellants argued, inter alia, that the letter of credit was instead part of a disguised financing transaction and was not part of the estate and therefore should not be made subject to § 502(b)(6). The disguise may have deceived the IRS, but not the bankruptcy court.

On 30 September 2002, the bankruptcy court entered an order granting partial summary judgment to BTI as to the issue of liability, leaving the issue of damages open. Two Trees, David Walentas, and Jane Walentas filed an interlocutory appeal of that order, and, on 10 June 2003, the United States District Court for the Northen District of Georgia entered an order affirming the district court. On 15 July 2004, the bankruptcy court entered a separate order and judgment in the amount of $1,175,995.44 in favor of BTI against Appellants. The district court affirmed the damages order on 30 September 2005. Appellants then appealed both the liability order and the damages order to our court.

## II. DISCUSSION

This appeal involves two issues: liability and calculation of damages. After examining our jurisdiction and the appropriate standard of review, we address

these issues in turn.

## A.  Jurisdiction

"Bankruptcy courts have jurisdiction, by reference from the District Courts, over 'all cases under Title 11 and all core proceedings arising under Title 11, or arising in a case under Title 11.'" In re Atlanta Retail, Inc., __ F.3d __, 2006 WL 1982782 at *8 (11th Cir. July 18, 2006) (citing 28 U.S.C. §§ 157(a), 157(b)-(c)). This matter relates to the substantive rights provided by 11 U.S.C. § 542 and related provisions of the bankruptcy code and is therefore a core proceeding arising under Title 11.  The district court had jurisdiction to review the bankruptcy court's orders pursuant to 28 U.S.C. § 158(a).  We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158(d).

## B.  Standard of Review

The bankruptcy court's findings of fact are reviewed "under the clearly erroneous standard."  In re Fetz, 244 F.3d 1323, 1326 (11th Cir. 2001). "[C]onclusions of law, whether from the bankruptcy court or the district court, are reviewed de novo."  Id.   The grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

10

Civ. P. 56(c).  Thus, our review of the bankruptcy and district courts' grants of summary judgment as to both liability and damages is <u>de novo</u>.

C.  <u>Liability</u>

This is a turnover action pursuant to 11 U.S.C. § 542.  There are two discernible arguments on appeal with regard to liability under this statute: (1) the standby letter of credit proceeds do not constitute property of the estate under the doctrine of independence; and (2) the standby letter of credit proceeds do not constitute property of the estate under South Carolina contract law.  We consider the law regarding § 542 generally before addressing these arguments.

1.  <u>11 U.S.C. § 542</u>

Under that statute and related sections of the code, a bankruptcy court "may generally order a third party to turn property in its possession over to the debtor's estate if three primary requirements are met."  <u>In re Lewis</u>, 137 F.3d 1280, 1282 (11th Cir. 1998) (citing 11 U.S.C. §§ 362(d)(1), 363(b)(1), 363(e), 542(a)).  "First, such property must be 'property of the estate.'  Second, at the moment the debtor filed a petition, the debtor must have had the right to use, sell, or lease the property.  Finally, upon request, the court must ensure that the third party's interest in the property is adequately protected."  <u>Id.</u>  (citations omitted).

"'Property of the estate' is defined broadly to include 'all legal or equitable

11

interests of the debtor in property as of the commencement of the case.'" Id. at 1283 (citing 11 U.S.C. § 541(a)(1); United States v. Whiting Pools, Inc., 462 U.S. 198, 204, 103 S. Ct. 2309, 2313 (1983) (observing that "Congress intended a broad range of property to be included in the estate" because "reorganization . . . would have small chance of success . . . if property essential to running the business were excluded from the estate")). While the question of "whether a debtor's interest constitutes 'property of the estate' is a federal question . . . the nature and existence of the [debtor's] right to property is determined by looking at state law." Id. (quoating In re Thomas, 883 F.2d 991, 995 (11th Cir. 1989)); see also Butner v. United States, 440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). When that state law determination is made, federal bankruptcy law [then] dictates to what extent that interest is property of the estate." In re Thomas, 883 F.2d at 995.

2. The Doctrine of Independence

Appellants argue that the common law doctrine of independence removes the proceeds of the DK Bank standby letter of credit from the property of the estate. Even assuming that South Carolina law recognizes this common law

12

doctrine under its adoption of the Uniform Commercial Code, the doctrine of

independence would not remove the letter of credit proceeds from the reach of 11

U.S.C. § 542.

Before addressing the application of the doctrine of independence to the

facts in this case, we examine the nature of the standby letter of credit.

> A standby letter of credit transaction is a three-party agreement
> involving two contracts and the standby letter of credit . . . .  The first
> party is the account party or customer . . . .  The second party is the
> issuing institution, usually a bank . . . .  The contract between the
> issuing party and the account party is one of the contracts involved in
> the letter of credit . . . .  The third party to a letter of credit transaction
> is the beneficiary of the letter of credit.  The contract between the
> account party and the beneficiary is one of the contracts involved in a
> letter of credit agreement.  The letter of credit itself, an obligation
> between the issuer and the beneficiary, is the final prong of a letter of
> credit transaction.

Resolution Trust Corp. v. United Trust Fund, Inc., 57 F.3d 1025, 1030 (11th Cir.

1995).[1]

While the facts in the case are more complicated than most letter of credit

transactions, based on the separate agreements and the many roles played by CIT,

the basic relationship among the parties under the Resolution Trust framework can

---

[1]Resolution Trust involved the repudiation of a lease pursuant to the Financial
Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(e).
Resolution Trust Corp., 57 F.3d at 1029.  However, we see no reason why its analysis of the
nature of the standby letter of credit would not similarly apply in bankruptcy.

be structured as follows. The first party (customer) is BTI. The second party (issuing institution) is DK Bank. The contract between BTI and DK Bank to establish the standby letter of credit, secured by the assets of BTI's estate, is the first contract. The third party (beneficiary) is Two Trees. The lease agreement between Two Trees and BTI is the second contract and governs the rights and obligations between those two parties and the conditions pursuant to which Two Trees can draw down on the letter of credit to satisfy BTI's obligations under the lease. Finally, the standby letter of credit is an obligation between DK Bank and Two Trees, which later assigned its interests in both the letter of credit and the lease agreement to CIT.

Because the standby letter of credit at issue was constructed as an independent obligation between DK Bank and Two Trees, Appellants argue that BTI's claim for the return of the letter of credit proceeds is excluded from the property of the bankruptcy estate. We do not agree. "[T]he doctrine of independence protects only the distribution of the proceeds of the letter of credit." In re Graham Square, 126 F.3d 823, 827 (6th Cir. 1997). As we explained in Resolution Trust, "[o]nce the proceeds of a letter of credit have been drawn down, the underlying contracts become pertinent in determining which parties have a right to those proceeds. In other words, an irrevocable standby letter of credit does

14

not nullify the obligations set forth in the underlying contracts." 57 F.3d at 1034-35 (emphasis added).[2] "Rather the letter of credit serves, among other things, to shift the burden of litigation . . . . [The] beneficiary of the letter of credit holds the stake during the litigation." Id. Here, BTI has not challenged the distribution of the letter of credit proceeds by DK Bank to Two Trees's assignee, CIT. Rather, it challenges the right of CIT to retain the letter of credit proceeds pursuant to the underlying contract between BTI and Two Trees, which in this case is the lease agreement. The doctrine of independence is therefore inapplicable. In the next section, we examine the rights and obligations pursuant to that agreement.

3. Whether BTI Has "Property" under South Carolina Contract Law

South Carolina law governs the lease agreement,[3] and we must therefore look first to South Carolina law to determine the nature and existence of BTI's right to the proceeds of the DK Bank standby letter of credit. See In re Thomas, 883 F.2d at 995. Under South Carolina law, "[t]here exists in every contract an

_____

[2]We have previously stated that "neither a letter of credit nor its proceeds are property of the debtor's estate." See In re Air Conditioning, Inc. of Stuart, 845 F.2d 293, 296 (11th Cir. 1988). However, that particular case involved the claims of a creditor with regard to the proceeds of a letter of credit under a 11 U.S.C. § 547(b) preferential transfer analysis. See generally id. It did not address the claims of a debtor pursuant to a § 542 turnover action, which includes in the property of the estate "all legal or equitable interests of the debtor in property as of the commencement of the case." See In re Lewis, 137 F.3d at 1283.

[3]Section 35.6 of the lease states that the lease is "governed by and construed in accordance with the laws of South Carolina."

implied covenant of good faith and fair dealing." Adams v. G.J. Creel & Sons, Inc., 465 S.E.2d 84, 85 (S.C. 1995). As such, in the absence of any provision to the contrary, there is a duty to return the excess proceeds drawn down from the standby letter of credit that were not used to secure BTI's obligations under the lease. Cf. Burbach v. Investors Mgmt. Corp. Int'l, 484 S.E.2d 119, 120-22 (S.C. Ct. App. 1997) (recognizing the common law claim of conversion for a landlord's improper retention of security deposit).

In justifying the retention of the entire $1.6 million drawn down from the DK Bank standby letter of credit, Appellants contend that the letter of credit was designed to make up the difference between the actual value of BTI's property and the mortgage between Two Trees and CIT. Thus, according to Appellants, the letter of credit secured not only BTI's obligation to Two Trees under the lease, but also Two Trees's obligations to CIT under the mortgage.

Before we continue, however, we cannot help but note that Appellants devote voluminous attention in their appellate briefs to the issue of whether the lease is a "true lease" or a secured financing arrangement under 11 U.S.C. § 502(b)(6). They repeatedly urge us to recharacterize the lease as a secured financing arrangement under federal common law's "economic realities" test so as to avoid the limitation on lessor damages under § 502(b)(6). Somewhat

16

overlooked, in our judgment, is the legal analysis of liability under 11 U.S.C. §

542. The "economic realities" test pursuant to the § 502(b)(6) recharacterization

analysis does not answer the more straightforward question of what rights BTI has

to the letter of credit proceeds under South Carolina law in a § 542 analysis, which

is an antecedent inquiry to any consideration of a limitation on damages under

federal law. Moreover, the recharacterization of the lease as a secured financing

arrangement, even under South Carolina law, does not necessarily insulate

Appellants from liability because property (or at least claims to such property)

relating to both a "true lease" and a secured financing arrangement can be subject

to turnover pursuant to § 542. See In re Lewis, 137 F.3d at 1283 ("'Property of the

estate' is defined broadly to include 'all legal or equitable interests of the debtor in

property as of the commencement of the case.'"); see also  11 U.S.C. §§ 541, 542.

Thus, our primary inquiry under § 542, and without regard to characterization, is

what are BTI's rights and obligations under the lease agreement between it and

Two Trees.

In determining what these rights and obligations are, we begin with the

terms of the leasing agreement itself. Under South Carolina law "[t]he intent of the

parties is to be determined solely from the language of a contract, if that language

is clear and unambiguous." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Havird,

17

518 S.E. 2d 48, 50 (S.C. Ct. App. 1999) (emphasis added). Further, "[a] court should give the terms of an unambiguous contract their plain, ordinary, and popular meaning." Id.

The lease agreement provides in section 7.3 that the letter of credit secured the rent and other amounts under the lease:

> 7.3 Support for Payment Obligations. Lessee covenants and agrees that it shall obtain and maintain in effect at all times during the Term, as further assurance of the payment by Lessee of all amount of Rent and other obligations payable by Lessee hereunder, a standby letter of credit, issued for the account of Lessee or a wholly owned subsidiary of Lessee, for the benefit of Lessor, in an amount available to de drawn at least equal to $1,600,000 or such lessor amount as Lessor or the Facility Mortgagee (as hereinafter defined) may specify, which letter of credit shall, among other things, be assignable for security to the Facility Mortgagee and otherwise be substantially in the form of the standby letter of credit issued by Dai-Ichi Kangyo Bank, Ltd., on or about the Closing Date, in satisfaction of Lessee's obligations pursuant to this Section 7.3.

(Emphasis added).

The lease refers in section 7.3 to the terms of the letter of credit. The letter of credit states the following:

> This Letter of Credit is being issued to you in your capacity as "Lessor" under the Lease Agreement dated as of October 10, 1995 (as amended and in effect from time to time, the "Lease") between you and Builders as "Lessee". The Credit Amount is intended to support Builders' obligation to pay rent and other amounts under the Lease.

(Emphasis added).

18

Section 15.2 lists an array of remedies available to Two Trees should a default occur.  Section 15.2(a) states that if BTI "abandons or vacates" the property, Two Trees "may enter upon and take possession of such Leased Property in order to protect it from deterioration and continue to demand . . .  the monthly rentals and other charges provided."  Under section 15.2(b), Two Trees can terminate the lease and seek and take possession.  Section 15.2(c) provides:

> (c) Lessor may make demand for payment under and apply or retain, as the case may be, the amount then available to be drawn under the standby letter of credit, as its remedy for any damages sustained by Lessor, arising out of termination of the Lease.

Section 15.3 provides:

> 15.3  Additional Expenses.  In addition to payments required pursuant to subsections (a) and (b) of Section 15.2 above, Lessee shall compensate Lessor for all reasonable expenses incurred by Lessor in repossessing the Leased Property (including any increase in insurance premiums caused by the vacancy of the Leased property), all reasonable expenses incurred by Lessor in reletting (including repairs, remodeling, replacements, advertisements and brokerage fees), all reasonable concessions granted to a new tenant upon reletting (including renewal options), all losses incurred by Lessor as a direct or indirect result of Lessee's default (including any appropriate action by a Facility Mortgagee), and a reasonable allowance for Lessor's administrative efforts, salaries and overhead attributable directly or indirectly to Lessee's default and Lessor's pursuing the rights and remedies provided herein and under applicable law.

(Emphasis added).

Appellants argue that these lease provisions, especially the underlined language in section 15.3, demonstrate that the letter of credit was intended to secure the mortgage of Two Trees to CIT, the facility mortgagee. We disagree.

As the bankruptcy court cogently observed in its 30 September 2002 order, this argument fails based on the unambiguous opening text of section 15.3, which provides that the losses referred to in that subsection are <u>in addition</u> to payments required in subsections (a) and (b), which requires the payment of rent. "Hence, even assuming that having to pay the note to [CIT] was a 'loss,' that 'loss' and the loss of not receiving rent are the same loss, so that the 'loss' of having to pay the note is not <u>in addition</u> to the loss incurred for non-payment of rent. Moreover, Two Trees suffered no 'loss' by having to pay back a loan because it received the proceeds of the loan." Bankruptcy Order (30 Sept. 2002) at 19.

Reviewing the agreements, we can find no provision in the lease or the standby letter of credit that would indicate that the standby letter of credit was intended to secure the mortgage of Two Trees to CIT. Thus, under South Carolina contract law, BTI has a claim to the standby letter of credit proceeds retained by CIT based on the unambiguous language in the leasing agreement and the letter of credit. See <u>Merrill Lynch</u>, 518 S.E. 2d at 50.

Even if we were to conclude that these lease provisions were ambiguous, the

evidence in the record does not dictate a different result. Under South Carolina law, "[i]f the vital terms of a contract are ambiguous, then, in an effort to determine the intent of the parties, the court may consider probative, extrinsic evidence." Dixon v. Dixon, 608 S.E.2d 849, 852 (S.C. 2005). In this case, it is undisputed (1) that BTI did not execute and was not liable under the Two Trees mortgage; (2) that BTI did not execute any guaranty agreement under which BTI agreed to serve as guarantor for any debt represented by the Two Trees mortgage; and (3) that BTI did not execute any agreement under which BTI agreed to pay the debt that Two Trees owed to CIT under the Two Trees mortgage. Additionally, Appellants do not contest the bankruptcy court's conclusion that the minutes of the meeting of BTI Parent on 5 October 1995 and the unanimous consent to the resolutions authorizing BIT to enter into the various agreements relating to the lease agreement and sale of the property do not indicate that the letter of credit was intended to secure the mortgage of Two Trees.

On the other hand, Two Trees's primary partner, David Walentas, personally guaranteed the entire debt of Two Trees to CIT and all of the obligations of Two Trees to CIT related to that debt. While it is clear that the purchase price was influenced by the capital loss carryforward, there is no evidence concerning the actual fair market value of the Camden facility in October 1995. As such, a

conclusion that the letter of credit was intended to secure the difference between the actual fair market value and the purchase price is conjecture. Simply put, the record evidence is bereft of any intention <u>on the part of BTI</u> to secure the obligations of Two Trees to CIT.

Thus, we conclude that BTI's claim pursuant to the unlawful retention of the proceeds of the letter of credit of satisfies the definition of property[4] for purposes of § 542(a).[5] The next section examines the calculation of Two Trees's damages under the lease, and therefore the specific amount of the letter of credit proceeds that Appellants are obligated to return to BTI.

D. <u>Damages</u>

The proper calculation of damages for BTI under the bankruptcy code, as

---

[4]The second and third requirements set forth in <u>In re Lewis</u> are easily met. As to the second requirement, BTI either had the right to "use" the money at the date of petition, or, at least, the right to use its legal claim to the letter of credit proceeds to effect their return. <u>See In re Lewis</u>, 137 F.3d at 1282. As to the third requirement, we conclude that the bankruptcy court adequately protected Appellants' interest in the letter of credit proceeds because, as shown in the section on damages, we affirm the judgment of the bankruptcy court with regard to lessor damages. <u>See id.</u>

[5]On appeal, Appellants do not contest the conclusion of the bankruptcy court that, under state contract law, Two Trees is liable for any unlawful draw down and retention of the letter of credit proceeds because (1) CIT was its assignee under lease and the letter of credit and (2) Two Trees received the benefit of the proceeds of the letter of credit because they were applied to its mortgage. Furthermore, Appellants also do not contest that CIT, as Two Trees's assignee, was at least subject to the lease's implied covenant of good faith and fair dealing when CIT drew down the letter of credit proceeds. <u>See</u> 6 <u>Am. Jur.</u> 2D Assignments § 162 ("An assignee is subject to the obligations imposed by the contract when he or she assumes those obligations, either expressly or impliedly.").

both Appellants and BTI agree, is to deduct from the $1.6 million proceeds of the standby letter of credit the amount of allowable damages by the lessor Two Trees. However, Appellants contend that the amount of damages incurred by Two Trees under the lease exceeds the $1.6 million letter of credit, and BTI is thereby entitled to nothing. In so doing, they argue that the bankruptcy court erred by concluding that the lease was a "true lease" for the purposes of 11 U.S.C. § 502(b)(6) and therefore subject to the cap on lessor damages therein.

Because the amount of a lessor's damages under a lease agreement also relates to the nature and existence of the debtor's right to property, we must review South Carolina law on contract damages before any subsequent application of federal law. See In re Thomas, 883 F.2d at 995. "It is the rule in South Carolina that when a lessee declines to perform his contract, a cause of action immediately arises in favor of the lessor for full damages, present and prospective . . . and the measure of damages is the difference between the rent fixed in the lease and the rental value of the premises for the entire term at the time of the breach, together with such special damages as may have resulted from the breach." Richman v. Joray Corp., 183 F.2d 667, 671 (4th Cir. 1950) (citing Simon v. Kirkpatrick, 139 S.E. 614 (S.C. 1927)). Thus, under South Carolina law, actual damages under the lease include unpaid rent, other agreed upon expenses, and special damages. See

23

id. Special damages are defined as "those that may reasonably be supposed to have been in the contemplation of both parties at the time of contracting as a probable result of a breach." Windham v. Honeycutt, 348 S.E.2d 185, 187 (S.C. Ct. App. 1986) (emphasis added). Moreover, the burden is on the party that seeks to recover special damages. See Jackson v. Midlands Human Res. Ctr., 374 S.E.2d 505, 506 (S.C. Ct. App. 1988). "If the . . . proof is speculative, uncertain, or otherwise insufficient to permit calculation of . . . special damages, [the] claim should be denied." Id.

Before addressing the damages for unpaid rent and other direct losses under the lease, we address the issue of special damages. Here, Appellants' claim to the entire $1.6 million letter of credit proceeds as special damages, without regard to what the lessor is actually owed under the lease agreement, is speculative. As discussed in the section on liability, there is no evidence in the record that BTI intended for the letter of credit to secure Two Trees's mortgage to CIT. Moreover, sections 5.1 and 8.1 of the lease state that Two Trees remains the owner of the leased property at the end of the lease. Articles I and XXXIV of the lease show that the initial term of the lease was only for five years and BTI had no right to renew the lease at the original rent amount. While the monthly rental payments under the lease equaled the monthly payment on Two Trees's mortgage to CIT, it

24

bears repeating that the time necessary to amortize the mortgage completely was considerably <u>longer</u> than the five year lease term. Under such facts, we would be hard pressed to conclude that BTI "contemplated" that the letter of credit would be used to satisfy Two Trees's mortgage beyond BTI's stated obligations under the lease. <u>See</u> <u>Windham</u>, 348 S.E.2d at 187.

Even assuming such a contemplation, Appellants have not provided us with a way to calculate special damages based on when the breach occurred, but instead suggest that any breach at any time during the time of the lease entitles them to $1.6 million because the letter of credit was designed to secure Two Trees's mortgage to CIT.[6] We cannot accept that conclusion. If BTI had performed all of its obligations under the lease throughout the five year term and opted not to renew the lease, Two Trees would not be entitled to the letter of credit because there would be no breach. If BTI had performed all of its obligations under the lease except for the payment of rent for the last month of the term, however, the legal conclusion that Two Trees or its assignee CIT could draw down and retain the entire $1.6 million letter of credit proceeds as special damages because of such

---

[6]On appeal, Appellants also do not contest the bankruptcy court's conclusion that section 15.2(c) of the lease, if construed as a liquidated damages provision, would be unenforceable under South Carolina law. <u>See</u> <u>Moser v. Gosnell</u>, 513 S.E.2d 123, 126-27 (S.C. Ct. App. 1999) ("The test for determining whether a stipulation constitutes a penalty is whether the sum stipulated is so large that it is plainly disproportionate to any probable damage resulting from breach of the contract." (quotations omitted)).

breach would be unsustainable. With regard to the proper calculation of special damages for a breach that occurred in the middle of the lease, Appellants unfortunately leave us to our own devises. We decline the challenge.

Additionally, Appellants point to no evidence in the record to show that Two Trees was forced to sell the Camden property when it did. Accordingly, any difference between the mortgage price and the later sale price of the Camden property is not properly considered special damages. See Jackson, 374 S.E.2d at 506. Neither can we discern any other special damages relating to Two Trees's obligation to pay its mortgage to CIT.

We now turn to unpaid rent and other direct losses under the lease. While the bankruptcy court started its damages calculation from the petition date under a § 502(b)(6) analysis, as opposed to the date under which BTI rejected the lease, which occurred after the petition date and presumably would be the starting point for the lessor damages calculation under South Carolina law (since BTI was current on its obligations under the lease until that date),[7] see Richman, 183 F.2d at 671, there is ultimately no difference in the amount of damages that Two Trees is

_____

[7]Even if we were persuaded that the sale of various assets by BTI constituted an anticipatory breach of the lease under South Carolina law, this event occurred before BTI stopped paying rent and would not change the amount of rent and other direct costs that Two Trees was entitled to under the lease. See Richman, 183 F.2d at 671. On appeal, BTI did not make the argument that the improper draw down by Two Trees's assignee CIT constituted a breach of contract by the lessor, thus absolving BTI of its remaining obligations under the lease. See U.S. Rubber Co. v. White Tire Co., 97 S.E.2d 403, 409 (S.C. 1956).

entitled to claim under the lease. Other than a different starting date and the potential application of the § 502(b)(6) damages cap, we see no difference, under the facts in this case, between the methodology of calculating unpaid rent, other direct losses, and appropriate credits under § 502(b)(6) and under South Carolina law.[8] BTI does not dispute that Two Trees is entitled to $424,004.56, the amount properly calculated by the bankruptcy court under a § 502(b)(6) analysis,[9] and we do not believe that any potential recalculation of lessor damages under state law would alter that amount.

Furthermore, because the lessor damages conceded on appeal by BTI are less than the statutory cap applied under a § 502(b)(6) analysis[10] and because Two

_____

[8]Assuming that § 502(b)(6) is properly triggered, we do not suggest in this opinion that a bankruptcy court order must provide a calculation of damages from the date of the breach under state law, and then provide another calculation of damages from the date required under § 502(b)(6). Such a duplicative effort would be unnecessary. As noted previously, once the state law determination is made as to what constitutes property pursuant to § 542, "federal bankruptcy law [then] dictates to what extent that interest is property of the estate." In re Thomas, 883 F.2d at 995.

[9]This amount is the sum of the total minimum rent due from the date of petition to the date of the sale of property, minus the amount of rent paid during that period, plus the total real estate taxes, insurance, and repair and maintenance costs incurred during that period. The date of petition was 1 June 1998 and the sale occurred on 9 September 1999. Two Trees's actual damage claim is limited to the date of the sale because there can be no claim for damages occurring after the sale of the property, and Appellants do not argue otherwise. See 25 Williston on Contracts § 66.86 (4th ed.). Applying de novo review, we agree with the bankruptcy court's calculations pursuant to § 502(b)(6).

[10]The cap under § 502(b)(6) is the greater of one year's rent, or 15%, not to exceed three years, of the rent for the remaining term. Under the lease, one year's rent is $453,900.00, not including other direct expenses that could be considered "rent" for purposes of § 502(b)(6). The bankruptcy court calculated Two Trees's maximum allowable damages for the 15 month/9 day

27

Trees and CIT have not proven that the lessor is entitled to anything more, we need not wade into the factor-intensive thicket regarding the proper characterization of this lease agreement as either "true lease" or a secured financing arrangement under § 502(b)(6). As such, we do not address the argument that § 502(b)(6) is inapplicable because Two Trees did not file a claim against the estate. Moreover, that issue was not presented to the district court after the bankruptcy court determined in its damages order that such a filing was not necessary because Two Trees was a secured creditor and, once CIT drew down the letter of credit, Two Trees no longer had a claim. See Denney v. City of Albany, 247 F.3d 1172, 1182 (11th Cir. 2001) (holding that issues not briefed on appeal are deemed abandoned); see also In re Walker, 959 F.2d 894, 896 (10th Cir. 1999) (declining to consider bankruptcy issues that were not raised in an appeal to the district court).[11] It bears repeating, however, that the turnover action taken by BTI pursuant to § 542 was not predicated on the fact that its lessor's assignee retained funds in excess of the

period from the date of petition to the day of the sale as $424,004.56. Because this amount is less than one year's rent under the lease, the statutory cap under § 502(b)(6) is not applicable.

[11]Additionally, we need not judge the whether the lease was improperly rejected pursuant to 11 U.S.C. § 365, which applies only to "true leases," see In re Martin Bros. Toolmakers, Inc., 796 F.2d 1435, 1439-40 (11th Cir. 1986), because this issue likewise does not affect the amount that BTI's estate is entitled to under 11 U.S.C. § 542. Furthermore, in their appellate briefs, Appellants cite this statute only in the context of the § 502(b)(6) damages calculation. They make no argument that the lease was not terminated by operation of law on 11 November 1998, pursuant to 11 U.S.C. § 365, let alone address the consequences thereof. Thus, that argument is abandoned. See Denney, 247 F.3d at 1182.

28

§ 502(b)(6) damages cap, but rather on the fact that its lessor's assignee was not entitled to retain the funds pursuant to the underlying lease agreement.[12]  In any event, as we have previously concluded, the damages cap under § 502(b)(6) was not applied, and the Appellants have not proven any more lessor damages than those already conceded by BTI.  BTI's estate is thereby entitled to $1,175,995.44, which is the difference between the $1.6 million letter of credit proceeds retained by CIT and Two Trees's $424,004.56 damages for breach of the lease.

## III.  CONCLUSION

We conclude that BTI's claim for the return of the standby letter of credit proceeds is "property of the estate" pursuant to 11 U.S.C. § 542.  We also conclude that the bankruptcy court's calculation of damages in the amount of $1,175.995.44 is correct, insofar as BTI concedes the amount of lessor damages properly calculated by the bankruptcy court in a § 502(b)(6) analysis, the calculation accords with South Carolina law, and Appellants have not shown that they are entitled to anything more.  As such, Appellants are liable to BTI jointly and severally in that amount.  **AFFIRMED.**

---

[12]Thus, we believe that our opinion is not in conflict with the Fifth Circuit's recent case, In re Stonebridge Technologies Inc., 430 F.3d 260, 270 (5th Cir. 2005) (per curiam), which held that the filed claim of a lessor against the estate was a precondition to applying the damages cap under § 502(b)(6).  The court further held that debtor did not have any common law actions against the lessor pursuant to the terms of the lease.  See id. at 274.  In this case, however, BTI has a common law action against Appellants based on the unlawful retention of the letter of credit proceeds, and, moreover, the damages cap under § 502(b)(6) was not applied.